(Nos. 64480, 64481 cons.—

McLEAN COUNTY BANK, Appellee, v. CHARLES E. BROKAW, SR., *et al.*, Appellants.

*Opinion filed January 25, 1988.*

CUNNINGHAM, J., took no part.

William F. Costigan and Michael D. Boge, of Costigan & Wollrab, P.C., of Bloomington, for appellants.

Livingston, Barger, Brandt & Schroeder, of Bloomington (Thomas M. Barger III and Peter W. Brandt, of counsel), for appellee.

JUSTICE WARD delivered the opinion of the court:

The plaintiff, McLean County Bank, filed a two-count complaint against the defendants, Charles E. Brokaw, Sr., and his wife, Eleanor. Charles E. Brokaw, Sr. (hereafter Mr. Brokaw), was the defendant named in count I, which alleged breach of a guaranty agreement that he had executed, and which asked judgment in the amount of the principal, $250,000, plus interest. In the second count, the plaintiff sought recovery against Eleanor Brokaw (hereafter Mrs. Brokaw) for the principal amount of $200,000 on a separate guaranty agreement, which was executed by both Mr. and Mrs. Brokaw. Following a bench trial in the circuit court of McLean County, judgment was entered for the plaintiff on count I against Mr. Brokaw for the principal amount of $250,000, plus accrued interest. The court decided in favor of Mrs. Brokaw on the second count, which was based on the guaranty agreement signed by both defendants. The plaintiff appealed, seeking to reverse the trial court's judgment in favor of Mrs. Brokaw. Mr. Brokaw also appealed, contending that the plaintiff could not recover on either guaranty agreement. The appellate court affirmed in part, reversed in part, and modified the judgment. (148 Ill. App. 3d 103.) Both Mrs. Brokaw and Mr. Brokaw

filed petitions for leave to appeal to this court, which petitions were allowed (107 Ill. 2d R. 315(a)) and consolidated for appeal.

The McLean County Bank (hereafter the Bank) began making loans in 1977 to the defendants' son, Charles E. Brokaw, Jr., to finance his farming business. The defendants, at the Bank's request, signed a guaranty agreement on January 24, 1977, in the principal amount of $50,000 as security for their son's debt. In the following year, the Bank agreed to make an additional loan to the defendants' son and requested that the defendants execute another guaranty agreement in the principal amount of $75,000. The defendants signed the second guaranty agreement, which the parties agreed would be substituted for the first agreement. At the time the $75,000 guaranty agreement was signed by the defendants, Charles Brokaw, Jr., owed the Bank $133,466.17. The defendants later signed a $100,000 guaranty in December 1978, at which point the junior Brokaw was indebted to the Bank for $182,957.01. About a year later, on November 5, 1979, the first of the two guaranty agreements involved here, the $200,000 agreement, was. signed by both Brokaws.

The Bank then requested by letter that the Brokaws sign a $250,000 guaranty agreement. The younger Brokaw at that time owed $216,724.23. Mrs. Brokaw refused to sign the $250,000 agreement, but Mr. Brokaw signed it on March 28, 1980. Mr. Brokaw testified that he signed the $250,000 agreement without his wife's knowledge. Both defendants testified that they understood the agreements guaranteed they would be liable up to the principal amounts specified in the agreements. The Brokaws testified it was the Bank's practice to request a new loan guaranty when the outstanding indebtedness reached the upper limits of an existing guaranty.

The Bank's former agriculture loan officer, Robert Fry, who had acted in these transactions as the Bank's representative, testified that the Bank, after both the $200,000 and the $250,000 agreements had been executed, considered that it had guaranties for $450,000, the total of the two guaranties. The Bank, in April 1981, asked the defendants to execute a $300,000 loan guaranty, but neither of the defendants did so. The junior Brokaw owed the Bank $291,785.34 at that time. Fry could not explain why the Bank sought a $300,000 agreement when it believed it already had $450,000 guaranteed by the defendants. It had been the practice between the parties, Fry testified, that when a subsequent loan agreement was signed for a greater amount, the prior agreement was deemed replaced, except that he believed the $250,000 agreement was not to replace the $200,000 agreement.

Upon Charles Brokaw, Jr.'s default on his loan, the Bank filed this complaint. The trial court, as previously stated, decided in favor of Mrs. Brokaw on the $200,000 agreement, holding that, in the course of dealings between the Bank and the defendants since 1978, the subsequent guaranty agreements had superseded the previous agreements so that the $250,000 agreement signed by Mr. Brokaw had superseded the $200,000 agreement that had been previously signed by both defendants. The trial court decided for the Bank on the $250,000 guaranty agreement. The appellate court, however, held that Mr. and Mrs. Brokaw were jointly and severally liable on the $200,000 agreement, and for accrued interest, and held Mr. Brokaw individually liable for an additional $50,000, plus interest. This was the result, the court said, of his individually executing the $250,000 guaranty agreement.

The Brokaws contend the appellate court should be reversed because both guaranty agreements established,

under their terms, maximum amounts that could be loaned to the principal debtor, Charles Brokaw, Jr. When the Bank loaned the junior Brokaw in excess of the principal amount specified in the guaranty agreements, there was a breach, they argue, releasing them from all liability as guarantors. The Bank contends that a guarantor is not discharged from its obligation by an extension of credit in excess of the amount stated in the agreement, particularly where the guarantor has knowledge of and assents to such action.

The $250,000 guaranty agreement, where relevant, provides:

> "FOR VALUE RECEIVED, and for the purpose of enabling Charles E. Brokaw, Jr. (hereinafter called the "Debtor") to obtain credit or other financial accommodations from McLEAN COUNTY BANK, Bloomington, Illinois (hereinafter called the "bank"), the undersigned hereby guarantee(s) absolutely and unconditionally the prompt payment when due, whether at maturity, by declaration, demand or otherwise, of any and all indebtedness from the Debtor to the Bank in a principal amount not to exceed $250,000.00 (Two Hundred Fifty Thousand & no/100) Dollars in aggregate at any one time outstanding, plus such interest as may accrue theron [sic], whether such indebtedness is incurred as principal, guarantor or endorser, is direct or indirect, absolute or contingent, due or to become due or whether such indebtedness is now existing or arises hereafter, ***.
> ***
> Each of the undersigned waives presentment, protest, demand, notice of dishonor or default, notice of acceptance of this guaranty, notice of loans made, extensions granted, or ther [sic] action taken in reliance hereon and all demands and notices of any kind in connection with this guaranty or the [i]ndebtedness."

The terms of the $200,000 agreement were identical, except for the specified amount and the number of signatories.

The rules of construction of contracts apply generally to contracts of guaranty. (*State Bank v. Cirivello* (1978), 74 Ill. 2d 426.) The function of the court is to effectuate, if ascertainable, the intent of the parties to the contract. (*Blackhawk Hotel Associates v. Kaufman* (1981), 85 Ill. 2d 59.) A guarantor is to be accorded the benefit of any doubt which may arise from the language of the contract, and his liability is not to be varied or extended by construction or implication beyond its precise terms. Where the language of a contract is unequivocal, it must be carried out according to its language (*United Airlines, Inc. v. City of Chicago* (1987), 116 Ill. 2d 311, 318), but if it is ambiguous or there is a question of the parties' intentions, subsequent acts of the parties may be considered as evidence of their intentions (*Johnstowne Centre Partnership v. Chin* (1983), 99 Ill. 2d 284, 288). A trial court's determination on a guaranty agreement will not be set aside unless contrary to the manifest weight of the evidence. *Cirivello*, 74 Ill. 2d at 432.

The appellate court correctly observed that generally the specification of a maximum principal amount in a guaranty agreement indicates the intention of the parties to limit the amount of the guarantor's liability, and not to limit the amount of credit that may be extended to the principal debtor. (148 Ill. App. 3d 103, 105-06, citing Annotation, 57 A.L.R.2d 1209, 1211 (1958); see also 10 Williston, Contracts §1241 (3d ed. 1967).) In the absence of an expressed intention in the contract that the maximum amount of credit specified is to be a limitation on the amount of credit to be extended and an absolute condition of the guarantor's undertaking, the extension of credit beyond that amount does not discharge or release the guarantor of liability on the specified amount. This has been recognized in this State for nearly a century (*Taussig v. Reid* (1893), 145 Ill. 488, 496), and the holding has been consistently followed (*Frost v. Stand-*

*ard Metal Co.* (1905), 215 Ill. 240; *Scovill Manufacturing Co. v. Cassidy* (1916), 275 Ill. 462; see also *Bank of Homewood v. Sjo* (1983), 113 Ill. App. 3d 179; *Union Carbide Corp. v. Katz* (7th Cir. 1973), 489 F.2d 1374 (applying Illinois law)).

The appellate and trial courts correctly held that the principal amounts stated in these contracts were limitations on the guarantors' liability, as there was no express provision that the amounts specified were limitations on the credit that could be extended. The agreements by their terms are absolute and unconditional undertakings in that the signatories promised to pay the maximum principal amounts if the principal debtor defaulted. The language in the agreements stating "whether such indebtedness is now existing or arises hereafter" is an extension of the guaranty to indebtedness existing in the future, and such language has been held to constitute a continuing guaranty to cover past, present and future debts, up to the specified amount. (*Bank of Naperville v. Holz* (1980), 86 Ill. App. 3d 533, 538; *Holland v. First National Bank* (Tex. Civ. App. 1980), 597 S.W.2d 406, 408; *Chris Craft Industries, Inc. v. Van Valkenberg* (Fla. 1972), 267 So. 2d 642, 646.) The agreements also provide that the Bank does not have to notify the guarantors of loans made to the debtor. The guaranties looked to a future course of dealing between the Bank and the junior Brokaw so that a succession of credits was to be extended, but the defendants were liable only up to the principal amounts, plus interest, specified in the agreements.

The Brokaws say that the increased extensions of credit were material changes in the guaranty agreements that increased their risks. It is true, as the Brokaws say, that a material change that increases the guarantors' liability, without their consent, may discharge their obligations. (10 Williston, Contracts §1243 (3d ed.

1967); see also *Mamerow v. National Lead Co.* (1903), 206 Ill. 626, 634.) That the Bank loaned their son in excess of the principal amount specified in either guaranty does not increase the Brokaws' liability because the amount specified represents the total amount for which they would be liable, regardless of the amount of credit extended to their son. The Brokaws' own exhibits and testimony show that the Bank had extended credit greater than the amounts guaranteed in the $50,000, $75,000, and $100,000 agreements, yet the Brokaws had not previously protested the practice. Very commonly, the indebtedness owed by the principal debtor will be greater than that specified as guaranteed by the guarantor. (Restatement of Security §82, comment G (1941).) The amount stated in each of the guaranties, as the appellate and trial courts both held, was a limitation upon the liability of the guarantors, not a limitation upon the credit to be extended to the principal debtor.

The Brokaws reliance on *King Korn Stamp Co. v. Guaranty Bank & Trust Co.* (1969), 114 Ill. App. 2d 428, is misplaced, as a clause in the contract there providing that the lender could extend additional credit beyond the amount specified had been stricken, with lines drawn through each word, so that it did not become a part of the agreement. Thus, the court found that the Bank breached the agreement by extending credit that exceeded the amount specified, releasing the guarantors. The other two decisions relied upon by the Brokaws, *Ryan v. Trustees* (1852), 14 Ill. 20, and *Lawndale Steel Co. v. Appel* (1981), 98 Ill. App. 3d 167, are not on point as the facts and wording of the contracts under consideration there are very different from that here.

The Brokaws next contend that the Bank's acceptance of the $250,000 guaranty agreement from Mr. Brokaw, who was the co-guarantor on the $200,000 agreement, substituted for, and superseded the prior

obligation, thus releasing the co-guarantor, Mrs. Brokaw, from liability on the prior obligation. The Bank counters that a novation and discharge of obligation occurs only when a creditor agrees to substitute a new debt for an existing obligation. Without the agreement of both parties to a substitution of contracts, the Bank says no substitution can occur.

A substituted contract is one that is itself "accepted by the obligee in satisfaction of the obligor's existing duty." (Restatement (Second) of Contracts §279 & comment *a* (1979)). Corbin states: "When two persons are jointly indebted to another the creditor may accept the note of one of them as a mere additional security or as an immediate substitution and satisfaction. If the latter is found to be the fact, there is a discharge by novation. The debtor executing the note is now bound only on the note so given by him and the other debtor is wholly discharged." (6 Corbin, Contracts §1298, at 224 (2d ed. 1962); see also 6 Corbin, Contracts §1293, at 192-93 (2d ed. 1962).) The trial court considered the latter to be the fact—that the $250,000 agreement was a substitute contract rather than additional security—and that conclusion will not be set aside unless contrary to the manifest weight of the evidence. *People ex rel. Daley v. Warren Motors, Inc.* (1986), 114 Ill. 2d 305, 320; *Cirivello*, 74 Ill. 2d at 432.

The Bank concedes that when subsequent guaranty agreements were signed, they replaced earlier agreements, but it contends that Mrs. Brokaw's failure to sign the $250,000 agreement leaves her liable on the $200,000 agreement based on the joint and several liability clause of that agreement. For a substituted contract to come into existence, the creditor must have consented to the substitution of the new debtor, agreeing to release the original debtor and accepting the new debtor. (*Burnett v. West Madison State Bank* (1940), 375 Ill. 402,

410; 15 Williston, Contracts §1865, at 585-86 (3d ed. 1972).) The creditor's assent to the substitution of a new obligor may be inferred from his conduct and other circumstances attending the transaction. (*Burnett*, 375 Ill. at 410; 6 Corbin, Contracts §1297 (2d ed. 1962).) The Bank did not require that both defendants sign the $250,000 guaranty agreement as a condition to accepting the guaranty, as in *Cirivello*, 74 Ill. 2d 426, which rendered the guaranty there incomplete and unenforceable. (See Restatement of Security §§101(1), (2) (1941).) The Bank's former loan officer who approved these guaranties, Robert Fry, was not able to explain why the Bank sought a $300,000 guaranty agreement from the Brokaws when the Bank believed it already had $450,000 guaranteed through the totals of the two agreements here. It is apparent that the $250,000 agreement was not intended to provide additional security to the $200,000 guaranty, for there would be no reason—and Fry offered none—for the bank to seek a $300,000 agreement if it believed it had accumulated guaranties of $450,000 from the defendants. As the trial court found, it had been the practice of these parties that when a new agreement was entered into, it replaced the immediately prior agreement. The findings of the circuit court are supported by the evidence. The parties' consent to a substituted agreement rescinded the $200,000 agreement and discharged Mrs. Brokaw's, as well as Mr. Brokaw's, obligations under that contract. Mr. Brokaw, as the signatory, is liable on the substituted agreement, as the trial court correctly held.

The Brokaws also contend the Bank breached its obligation of good faith and fair dealing, which they say is implied in every contract, through its failure to provide updated financial statements of the younger Brokaw when the Bank requested subsequent guaranty agreements. This breach, it is contended, terminated the Bro-

kaws' liability on the notes. The trial court had stricken this affirmative defense before trial, and the appellate court did not reach this issue. It is true that it is a defense in a guaranty contract where the creditor knows facts that materially increase the risk beyond that which the creditor has reason to believe the guarantor intends to assume and fails to notify the guarantor of such facts, which the creditor may reasonably believe are unknown to the guarantor. (Restatement of Security §124 (1941).) Comment b to this section, however, states, "It does not place any burden on the creditor to investigate for the surety's benefit. It does not require the creditor to take any unusual steps to assure himself that the surety is acquainted with facts which he may assume are known to both of them." Restatement of Security §124, comment b (1941).

The defendants, by the terms of the agreement, waived notice of loans made and extensions granted. The Brokaws, though, point out that the Bank, when it requested them to sign the $75,000 agreement, had sent them a financial statement of the junior Brokaw, dated December 28, 1976, indicating his net worth to be $89,000 when the Bank was in possession of a February 2, 1978, financial statement showing the younger Brokaw's net worth to be $10,904. The letter from Robert Fry requesting the new agreement, however, states, "I have had a lot of discussion with Chuck [the younger Brokaw] and it appears that his net worth dropped substantially this year, as a matter of fact, somewhere between $60,000 to $80,000." The letter can hardly be said to have concealed the younger Brokaw's financial decline.

The Bank, as shown by letters in the record and the testimony of its former loan officer, Robert Fry, kept the Brokaws sufficiently apprised of what was occurring with their son's financial situation. Too, Mrs. Brokaw, al-

though she said that her son primarily discussed with her husband how the loans were being used in the farming operation, testified that her son also discussed his farming and his financial situation with her. She said she was "always concerned" about her son's farming operations "because that was a lot of money." Mrs. Brokaw had also asked the Bank in April 1981 to take a second mortgage on her son's home and later asked the Bank to pay a $307 premium on her son's property insurance policy. This conduct shows the defendants were aware of, and even actively involved in, the financial dealings between the Bank and their son. There was certainly sufficient evidence to show that the defendants knew their son was into a continually worsening financial position and signed new guaranty agreements, notwithstanding that awareness. There was no good-faith violation by the Bank in failing to keep the Brokaws apprised of information it could reasonably assume was already known to them.

For the reasons given, the judgment of the appellate court is reversed, and the judgment of the trial court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*

JUSTICE CUNNINGHAM took no part in the consideration or decision of this case.