**REAL ESTATE VALUE COMPANY,**
**Plaintiff,**

v.

**USAIR, INC., Defendant.**

No. 94 C 6126.

United States District Court,
N.D. Illinois,
Eastern Division.

Sept. 30, 1997.

---

**734**

George L. Saunders, Jr., Matthew Eric Van Tine, Gwen Anne Niedbalski, Saunders & Monroe, Terry Rose Saunders, Law Offices of Terry Rose Saunders, Chicago, IL, for plaintiff.

Christina M. Tchen, Charles F. Smith, Jr., Dalya Sarai Khan, Skadden, Arps, Slate, Meagher & Flom, Marc William O'Brien, Deborah Gomolka Cole, Aronberg, Goldgehn, Davis & Garmisa, Chicago, IL, for defendant.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

Real Estate Value Company ("RVC") sued USAir, Inc.[1] ("USAir") for breach of contract and fraud. The parties filed cross-summary judgment motions. USAir also moves to strike the testimony of the plaintiff's expert. For the following reasons, RVC's motion for summary judgment is granted, and USAir's motion for summary judgment is granted in part and denied in part. USAir's motion to strike is granted.

### Background [2]

RVC was incorporated in January, 1991. The concept behind RVC was the purchase of discount travel certificates from travel suppliers such as airlines, hotels, rental car companies, and cruise lines, and the resale of such certificates to others for use as marketing incentives in promotions. James George is the president, sole stockholder, and sole employee of RVC. USAir operates a commercial airline.

In early January, 1991, Mr. George approached Pat Dewey, Senior Director of Advertising and Sales Promotions at USAir, and discussed the concept of using air travel certificates for promotions. Later in January, 1991, Mr. George wrote to Michael Buckley, Senior Director of Business Sales of USAir, regarding the purchase of discounted air travel certificates for use in RVC promotions. Negotiations between RVC and USAir regarding the sale of discounted air travel certificates continued over several months. On June 10, 1991, Mr. George sent USAir a packet of information including a proposed contract, a legal memorandum prepared by RVC's attorney concerning the le-

---

1. In 1997, USAir, Inc. changed its name to U.S. Airways, Inc.

2. The following facts are undisputed. Both parties filed 12(M) Statements, N.D. Local R. 12(M)(3), 12(N) Responses and Additional Facts, N.D. Local R. 12(N)(3), and 12(M) Replies. N.D. Local R. 12(M)(3). I will cite to various documents as (Pl.'s 12(M) Reply ¶___ ), (Def.'s 12(M) Reply ¶___.), etc. The statements pursuant to N.D. Local R. 12 are accompanied by exhibit appendices. I will identify exhibits by their corresponding "tab" numbers, e.g., (Def.'s App. to 12(M) Reply, Ex. ___ ). Finally, I will cite depositions directly, e.g., (George Dep. at ___.)

gality of RVC promotions under the Real Estate Settlement Procedures Act of 1974 and the Illinois Title Insurance Act, draft advertising materials for the promotion of title insurance, and other materials. On July 25, 1991, RVC sent USAir a letter that noted the parties were very close to agreeing on terms for travel certificates and presented a list of items that needed to be clarified before a final agreement was reached.

On July 30, 1991, USAir sent RVC a letter which is reproduced in full:

Dear James George:

Regarding your letter of 7/25 USAir is willing to sell the Real Estate Value Company the following value in Certificates:

- $350 value units at $225.00
- $300 value units at 25% discount
- $400 value units at 25% discount
- $500 value units at 25% discount

All certificates have the following restrictions/rules

- Non refundable
- 14 day advance reservation
- Fare chosen determines booking class
- No blackouts
- Good for travel within the contiguous 48 states and San Juan
- Cannot be used in conjunction with any other coupon/certificate offer, previously issued tickets, promotional offerings, senior citizen "Golden Opportunity Book", student, convention group, military tour, family plan, travel industry discount or USAir travel voucher.
- Certificates are not transferable and may not be brokered or sold
- Certificates is [sic] void if altered, counterfeited or copied
- Lost, Stolen, or otherwise destroyed Certificates will not be replaced
- Original Certificates can only be redeemed through USAir's City Ticket Offices, Airport Ticket Offices or authorized travel agency
- Certificates will have a 13 month "Valid for Travel" window. The date of issue of the Certificate will determine expiration date.

Only one Certificate may be used in the purchase of a ticket from USAir. You cannot use multiple Certificates to offset the price of a single ticket. Certificate is deemed fully used when exchanged for a ticket from USAir.

USAir will extend a rolling 150 day window to the Real Estate Value Company to renew the agreed purchase price. If no order is placed within the 150 day window the agreement is terminated. There will be no refund to the Real Estate Value Company on the $350 units, for Certificates issued but not used. USAir will review the program at the close of the 13 month period to determine usage on the $300/$400/$500 Certificates. Those determined as "Not used" will be valued at the selling price and travel authorization for that amount will be issued to the Real Estate Value Company. No cash will be refunded. The resulting travel authorization will have a validity of 12 months from the date of issue.

The Real Estate Value Company will be required to submit a list of those individuals who have received Certificates on a monthly basis.

The Real Estate Value Company cannot use USAir's name in any promotion or marketing effort in merchandising its product to the general public or other third parties involved in selling of same without the express written authorization of USAir.

USAir requires a minimum purchase of ($25,000) twenty-five thousand dollars to start this Program. You can select from the pricing structure the number of units needed to meet minimum dollar requirements.

Jim, there is no negotiations regarding the above. If you are ready to buy we are ready to serve. In any case, the pricing offered will not be available after September 1, 1991. I trust we can conclude before that date.

Michael F. Buckley

Director, Business Sales

RVC subsequently sent USAir funds to purchase the first group of air travel certifi-

cates. These certificates were received in November, 1991. The travel certificates received by RVC required that they be used for round-trip travel and coach class seats, necessitated Saturday night stays, and had blackout dates. RVC returned the certificates to USAir stating that they did not conform to the agreement between the parties. USAir issued new certificates which contained a one-month expiration date and stated they were redeemable only at USAir city and airport ticket offices. RVC again returned the certificates to USAir, requesting replacement certificates that conformed to the parties' agreement.

On October 29, 1992, the parties entered into an Amendment to the agreement.[3] The First Amendment provided that USAir would exchange all unredeemed certificates it had previously sold to RVC for new certificates that conformed to the terms of the parties' original agreement. The First Amendment also provided for a new termination date for the agreement between RVC and USAir and noted that aside from the changes specifically mentioned in the Amendment, the original agreement between USAir and RVC would remain in full force and effect. The Amendment provided that "[i]t is a condition to this Amendment" that USAir provide certificates conforming to the contract by January 10, 1993.

The parties continued to disagree regarding the proper form and restrictions of the certificates. Ongoing discussions took place in an effort to resolve the dispute. On April 20, 1994, USAir offered, by letter, to exchange the remaining travel certificates for properly issued substitutes and to extend the termination date of the agreement from June 30, 1994, to July 1, 1995. RVC accepted this offer on April 26, 1994, pursuant to additional terms discussed in a telephone conversation. (Pl.'s App. to 12(M) Statement, Ex. 36).[4] One of these terms was that USAir would forward a letter agreement that "waive[d] any prior defaults of either party."

**3.** The parties have labeled the October 29, 1992 Amendment the "First Amendment."

**4.** The parties labeled this second set of new agreements the "Second Amendment." The parties never completed a formal, final agreement

On July 14, 1994, Frank J. Cotter, Assistant General Counsel of USAir, wrote to RVC stating that USAir was in the final stages of printing new travel certificates for RVC, but that the certificates could only be used in connection with "premium incentive packages involving title insurance, mortgages, and apartment leases." (Pl.'s App. to 12(M) Statement, Ex. 40). RVC, stating this was a new condition on the certificates, refused to accept the limitation. This was apparently the last straw for RVC and this litigation followed.

### RVC's Contract Claims

■ RVC moves for summary judgment on the breach of contract claims in its complaint. RVC's breach of contract claims allege USAir refused to honor the July 30, 1991 agreement, the First Amended contract, the Second Amended contract, and that the certificates that were tendered by USAir did not meet the terms of the contracts. To establish breach of contract under Illinois law, RVC must show (1) the existence of a valid and enforceable agreement; (2) performance by the plaintiff; (3) breach of the agreement by the defendant; and (4) damages or injury proximately resulting from the breach. *Chamberlain Mfg. Corp. v. Maremont Corp.*, No. 92–0356, 1995 WL 103803 at *7 (N.D.Ill. Mar.6, 1995)(citing *Nielsen v. United Services Auto. Assoc.*, 244 Ill.App.3d 658, 183 Ill.Dec. 874, 876, 612 N.E.2d 526, 528 (2d Dist.1993)).

■ "Whether a contract exists, its terms, and the intent of the parties are questions of fact." *Mulliken v. Lewis*, 245 Ill.App.3d 512, 185 Ill.Dec. 730, 733–34, 615 N.E.2d 25, 28–29 (4th Dist.1993) (citations omitted). Under Illinois law:

[a] contract is ambiguous if, and only if, it is reasonably or fairly susceptible of different constructions, and it is not ambiguous if a court can determine its meaning without any guide other than a knowledge of

that constituted a contract in regards to this exchange of letters. But, since the parties have chosen to, I will consider the Second Amendment a completed contract.

the simple facts on which, from the nature of the language in general, its meaning depends. Also, where it is not ambiguous, the intent of the parties must be determined from the language of their agreement alone and contract language is not rendered ambiguous simply because the parties do not agree upon its meaning.

*Berutti v. Dierks Foods, Inc.*, 145 Ill.App.3d 931, 99 Ill.Dec. 775, 777, 496 N.E.2d 350, 352, (2d Dist.1986) (citations omitted).

RVC argues that the July 30, 1991 letter contained the entire agreement between itself and USAir. USAir disputes that the letter was a contract or that it contained all of the terms and conditions of the certificates. To this end, USAir presents the testimony of witnesses who contest RVC's claims. (Buckley Dep. at 32; St. George Dep. at 27, 30, 34–35; Howard Dep. at 34, 55).

██ USAir's attempt to show that the July 30 letter was not a contract, however, is belied by admissions in both the First Amendment and the Second Amendment that the July 30, 1991 letter represented the original agreement between the parties. The First Amendment explicitly states it "amends a certain Agreement by and between RVC and USAir dated July 30, 1991." (Pl.'s App. to 12(M) Statement Ex. 23). This language is consistent with RVC's claim that the July 30, 1991 letter was a complete offer that only required RVC's acceptance to become a contract. The language of the July 30 letter itself indicates it was a non-negotiable offer that, once accepted, became the entire binding contract between the two parties.[5] RVC consented to the contract when it sent USAir a downpayment for the travel certificates.[6]

██ USAir also argues that the July 30 letter did not contain all of the terms and conditions on the travel certificates. "Under the parol evidence rule, oral testimony to vary the terms of a written document is not acceptable unless an ambiguity in the terms exist." *In re Marriage of Pylawka*, 277 Ill. App.3d 728, 214 Ill.Dec. 651, 656, 661 N.E.2d 505, 510 (2d Dist.1996). Most of the testimony USAir presents regarding the terms of the July 30 letter is irrelevant, since the individuals testifying did not negotiate the agreement. While Mr. Buckley did negotiate the agreement, there is no ambiguity in the language of the July 30 letter to make his testimony admissible. *See FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 622 (7th Cir.1989)(finding that "a self-serving statement ... that a party did not understand [a] contract to mean what is says (or appears to say) will not suffice [to show an ambiguity]"). The terms of the letter are very specific, setting out which restrictions will apply to the certificates. Additionally, Mr. Buckley himself wrote that there would be no negotiating the terms of the letter.[7]

USAir also argues that, even if the restrictions on the travel certificates are wholly incorporated within the July 30 letter, there is an ambiguity as to whether the certificates could only be used for real estate-related promotions or other types of promotions. The July 30 letter makes no reference to any restriction on the use of the certificates. While almost all of the information exchanged between the parties revolved around real estate-related promotions, there is no evidence Mr. George ever indicated RVC would only use the certificates for real-estate related promotions. Indeed, at one point, Mr. George sent a proposed contract to

---

5. USAir wrote to Mr. George: "Jim, there is [sic] no negotiations regarding the above. If you are ready to buy we are ready to serve." (Pl.'s App. to 12(M) Statement, Ex. 13).

6. USAir's argument that the July 30, 1991 letter was simply a response to Mr. George's July 25, 1991 letter and was, in fact, meant to incorporate all of the existing correspondence between the parties is without merit. The July 25 letter noted the parties were close to an agreement and set forth specific issues that needed to be resolved. When USAir began its July 30 letter with the phrase "[r]egarding your letter of 7/25 . . .,"

USAir was responding to the issues Mr. George raised with an offer of its own, which, by its very terms, was non-negotiable. It was not an offer that incorporated the entirety of the correspondence between the parties.

7. USAir's reliance on *J & B Steel Contractors v. C. Iber & Sons, Inc.*, 162 Ill.2d 265, 205 Ill.Dec. 98, 642 N.E.2d 1215 (1994) is misplaced. In that case, the contract in question specifically referenced a telephone proposal that was to be incorporated into the contract and the contract was clearly, on its face, incomplete. *Id.* 205 Ill.Dec. at 103, 642 N.E.2d at 1220.

USAir which stated the certificates would only "primarily" be used for real estate-related services. (Def.'s App. to 12(N) Statement of Add. Facts, Ex. 6).

Additionally, the First and Second Amendments did not mention a restriction on the use of the certificates. USAir did not even raise the issue of the use restriction on the travel certificates until July 14, 1994, two months after the parties negotiated the Second Amendment. Yet, Mr. George had sent USAir information regarding the use of travel certificates for supermarket promotions months before the parties agreed upon the Second Amendment. (Def.'s App. to 12(N) Statement of Add. Facts, Ex. 39). Given the evidence, there is no ambiguity as to whether there was a restriction on the use of the certificates. There was none.[8]

■ The July 30 letter is not ambiguous. The First Amendment states that the original agreement between the parties "shall remain in full force and effect in accordance with the terms and conditions set forth in the Agreement." The terms and conditions of the referenced "Agreement" are undoubtedly those in the July 30 letter. By incorporating the July 30 letter into the First Amendment, USAir essentially acknowledged that the terms and conditions of the letter were unambiguous and in full effect. There is also no doubt that RVC tendered the required money to buy the travel certificates offered in the July 30 letter and that USAir never provided certificates that conformed to the July 30 letter. Accordingly, USAir breached the July 30 letter contract.

RVC also claims that USAir breached the later agreements evidenced by the First and Second Amendments to the July 30 letter. The First and Second Amendments incorporated the terms and conditions of the July 30 letter. The First Amendment, entered into on October 29, 1992, simply extended the length that the terms of the July 30 letter would remain in effect and required USAir to tender conforming certificates by January 10, 1993.[9] (Pl.'s App. to 12(M) Statement, Ex. 23). USAir never presented RVC with certificates that conformed to the July 30 letter and quite certainly, did not do so by January 10, 1993. Thus, USAir breached the First Amendment just as it did the July 30 letter agreement.

The Second Amendment, entered into in April, 1994, required USAir to exchange the non-conforming travel certificates sent to RVC for certificates that conformed with the First Amendment. The Second Amendment stated "[t]hat all the terms and conditions of the original agreement and amendment shall remain in full force and effect." (Pl.'s App. to 12(M) Statement, Ex. 36). The original agreement is the July 30 letter. The Second Amendment, like the First Amendment, extended the length of the contractual relationship between RVC and USAir. At the time the parties agreed to the Second Amendment, USAir stated it was prepared to exchange the non-conforming certificates for properly conforming certificates and agreed the new certificates would be sent as quickly as possible. Again, USAir never sent RVC travel certificates that conformed to the terms and conditions of either the July 30 letter or the First Amendment. Instead, on July 14, 1994, USAir sent RVC a letter stating USAir was in the final stages of printing new travel certificates, but the certificates would not be sent unless RVC agreed to use the certificates solely for real estate-related promotions.

RVC was forced to wait for two months after USAir stated it was "prepared" to exchange the non-conforming certificates for proper certificates only to find that it would never receive certificates until it agreed to

---

8. Even if I were to find an ambiguity in this case, "the Illinois rule is well stated in that contract language which is ambiguous or uncertain should be resolved against the party which created it." *Berutti,* 99 Ill.Dec. at 777, 496 N.E.2d at 350. Since USAir wrote the July 30 letter, the ambiguities it now complains of, if they do exist, would be a product of its own poor draftsmanship and would be appropriately resolved in RVC's favor.

9. Despite the fact that the First Amendment stated that it was "conditioned" on USAir's tender of conforming certificates by January 10, 1993, the parties later agreed, in the Second Amendment, that the First Amendment remained in effect. *See infra.*

terms different from those expressed in the July 30 letter, and the First and Second Amendment. For the reasons discussed above, USAir's argument that it was simply acting in good faith by attempting to determine the exact terms and use restrictions of the certificates is not well taken. The Second Amendment was entered into almost three years after the July 30 letter agreement and noted that the terms of the July 30 letter agreement were to remain in full force and effect. USAir breached the terms of the Second Amendment by attempting to add a limitation on the use of the certificates and by never tendering conforming certificates to RVC.

USAir argues that the Second Amendment was either a substituted contract or an accord and satisfaction that waived any prior default of either party. "A substituted contract is one that is itself 'accepted by the obligee in satisfaction of the obligor's existing duty.'" *McLean County Bank v. Brokaw*, 119 Ill.2d 405, 116 Ill.Dec. 561, 565, 519 N.E.2d 453, 457 (Ill.1988)(quoting Restatement (Second) of Contracts § 279 & comment a (1979)). USAir argues the Second Amendment was a substituted contract because the April 26, 1994 letter, which was part of the Second Amendment, stated USAir would provide RVC with a letter agreement that would incorporate certain terms into the Second Amendment and "waive[] any prior defaults of either party." (Pl.'s App. to Rule 12(M) Statement, Ex. 36).

RVC responds that the Second Amendment was an executory accord. An executory accord "'is an agreement that an existing claim shall be discharged in the future by the rendition of a substituted performance.'" *Bradshaw v. Burningham*, 671 P.2d 196, 198 (Utah 1983)(quoting 6 Corbin Contracts § 1269 at 75 (1962)). If the substituted performance never occurs, a party may sue on either the original claim or the executory accord. *Id.* Executory accords are valid under Illinois contract law. *See Motive Parts Co. of Am., Inc. v. Robinson*, 53 Ill. App.3d 935, 11 Ill.Dec. 665, 670–71, 369 N.E.2d 119, 124–25 (1st Dist.1977)(discussing whether an executory accord was formed). "[T]he question of whether a new agreement is a substitute contract or an executory accord depends upon the intention of the parties." *Bradshaw*, 671 P.2d at 198 (citations omitted).

Given the totality of the evidence, I conclude that the Second Amendment is an executory accord. RVC had already been promised under the July 30 letter and First Amendment that USAir would provide conforming certificates. USAir has offered no evidence to support a claim that RVC would give up all of its rights and claims under the two previous contracts for yet another promise of future performance. The only logical reading of the Second Amendment is that it simply reiterated USAir's obligation to provide conforming certificates under the terms of the July 30 letter and First Amendment.[10] If USAir had performed under the Second Amendment, it would have satisfied its obligations under the July 30 letter and the First Amendment. In its April 20, 1994 letter, USAir stated it was prepared to issue conforming certificates. RVC accepted this offer of performance. But, as in the previous instances, the performance never occurred. USAir never fulfilled its obligations under the Second Amendment and is, thus, in breach of this contract. Since the performance never occurred, RVC can properly sue for breach on all three of its contracts with USAir.[11]

### Fraudulent Inducement and Mistake of Fact

While USAir breached each of its contracts with RVC, it may still avoid summary judg-

---

10. The cases USAir cites in support of a substituted contract are factually distinct. In *Bradshaw*, the substituted contract was necessary when the original agreement was frustrated by unforeseen circumstances in drilling a water well. 671 P.2d at 197–98. In *McLean County Bank*, the parties executed a series of debt guaranties of increasing value. 116 Ill.Dec. at 563–65, 519 N.E.2d at 455–57. Each guaranty was quite obviously meant to replace an earlier guaranty.

11. USAir's contention that RVC may only sue on the Second Amendment because it was an accord and satisfaction also fails. USAir never "satisfied" the accord, the Second Amendment, by actually performing. *Hrubos v. Helfrick*, 220 Ill. App.3d 787, 163 Ill.Dec. 229, 232, 581 N.E.2d 180, 183, (1st Dist.1991). Thus, like the situation of an executory accord, USAir may proceed under all of the contracts.

ment if it can prove it has a valid defense. USAir argues that the agreements should be rescinded based on fraudulent inducement and mistake of fact. USAir claims RVC falsely represented and USAir genuinely believed the travel certificates would only be used in real estate-related promotions.

### A. Fraudulent Inducement

■ To establish common law fraud under Illinois law, USAir must prove (1) a statement of a material fact, as opposed to an opinion, (2) that was false, (3) that was known or believed by RVC to be untrue, (4) that was reasonably relied on by USAir to its detriment, (5) that was made for the purpose of inducing reliance, and (6) that generated detrimental reliance leading to USAir's injury. *Weeks v. Samsung Heavy Ind. Co., Ltd.,* 126 F.3d 926, 942 (7th Cir.1997). Mr. Buckley testified he believed the agreement between USAir and RVC restricted the use of travel certificates to real estate-related promotions. (Buckley Dep. at 94–98). However, USAir has not presented testimony that RVC ever falsely stated the certificates would only be used for real estate-related promotions. In fact, Mr. George, at one point, sent a proposed contract to USAir which stated the certificates would only "primarily" be used for real estate-related services. (Def.'s App. to 12(N) Statement of Add. Facts, Ex. 6). Further, USAir did not even raise the issue of the use of the travel certificates until July 14, 1994, two months after the parties negotiated the Second Amendment. Yet, Mr. George sent USAir information regarding using travel certificates for supermarket promotions months earlier. (Def.'s App. to 12(N) Statement of Add. Facts, Ex. 39).

The mere fact Mr. Buckley may have "believed" the certificates would only be used for real estate-related promotions is insufficient to prove RVC fraudulently induced USAir to enter into the July 30 letter agreement. There is no evidence that Mr. George secretly planned to use the certificates for non-real estate-related promotions or knowingly made untrue statements to Mr. Buckley to induce him into entering the July 30 agreement. Thus USAir has not satisfied even the first

element required for a claim of fraudulent inducement. This defense therefore fails.

### B. Mistake of Fact

■ Rescission for mistake is proper under Illinois law if four elements are met: (1) the mistake is of a material nature, (2) the mistake is of such consequence that enforcement is unconscionable, (3) the mistake occurred notwithstanding the exercise of due care by the party seeking rescission, and (4) rescission can place the other party in *status quo ante. Siegel v. Levy Org. Dev. Co., Inc.,* 153 Ill.2d 534, 180 Ill.Dec. 300, 305, 607 N.E.2d 194, 199 (1992) (citation omitted).

■ There is no evidence that USAir believed the use of the certificates was a material part of the contract or that USAir exercised reasonable care in forming the contract. USAir could have contractually limited the use of the travel certificates to real estate-related promotions. Yet, the July 30 letter, a document drafted by USAir, is silent on the uses of the certificates. The First and Second Amendments also do not restrict the use of travel certificates. As noted above, the Second Amendment was drafted some months after discussions had occurred between Mr. George and employees of USAir regarding the use of the certificates in retail food promotions. (Def.'s App. to 12(N) Statement of Add. Facts, Ex. 39). Even if USAir believed the use of the certificates was a material issue, the fact it neglected to place a restriction in any of the three contracts with RVC shows a lack of due care by USAir. Accordingly, the defense of unilateral mistake must fail.

### Breach of Contract Damages

USAir claims that it is entitled to summary judgment on the contract claims because RVC cannot prove any damages. RVC seeks to recover damages in the following categories: (1) out-of-pocket expenses, (2) the value of Mr. George's time, (3) lost profits from real estate-related promotions, and (4) lost profits from supermarket-related promotions.

As an initial matter, "a failure of proof of damages does not justify the dismissal of a claim for breach of contract, as it does most

tort claims. The victim of a breach of contract is always entitled to nominal damages if he proves a breach but no damages." *Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1366, 1372 (7th Cir.1990) (district court should not have directed verdict on breach of contract counterclaim for lack of evidence on damages); *accord Hydrite Chem. Co. v. Calumet Lubricants Co.*, 47 F.3d 887, 891 (7th Cir.1995) ("when the breach of contract is shown[,] ... the plaintiff is entitled to nominal damages, even if he cannot show any injury from the breach"); *Doe v. United States*, 976 F.2d 1071, 1085 (7th Cir.1992)(citing *Schoeneweis v. Herrin*, 110 Ill.App.3d 800, 66 Ill.Dec. 513, 443 N.E.2d 36 (5th Dist.1982) (under Illinois law, if plaintiff cannot provide proper basis from which to determine damages, he is entitled to nominal damages). Nevertheless, a party may be entitled to summary judgment with respect to certain categories of damages sought. *Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust*, 846 F.Supp. 701, 715 (N.D.Ill.1994) (granting summary judgment "with respect to the portion of [damages] ... for lost profits").

"The measure of damages for breach of contract is the amount which will compensate the injured party for the loss which either fulfillment of the contract would have prevented or which the breach of it has entailed." *LeFevour v. Howorka*, 224 Ill.App.3d 428, 166 Ill.Dec. 698, 700, 586 N.E.2d 656, 658 (1st Dist.1991). "Absolute certainty concerning the amount of damages is not necessary to justify recovery where the existence of damages is established. Rather, evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *LeFevour*, 166 Ill.Dec. at 700, 586 N.E.2d at 658.

Illinois law generally restricts the ability of a new business to recover lost profits.[12] *Stuart Park Assocs. Ltd. Partnership v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir.1995); *SK Hand Tool*

*Corp. v. Dresser Indus., Inc.*, 284 Ill.App.3d 417, 219 Ill.Dec. 833, 840, 672 N.E.2d 341, 348 (1st Dist.1996) (unprofitable business). The evidence demonstrating lost profit, like any other loss, must provide "a reasonable basis for the computation of damages" and cannot be "conjecture or sheer speculation." *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 118 Ill.2d 306, 113 Ill.Dec. 252, 257, 515 N.E.2d 61, 66 (Ill.1987). This task is particularly complicated in regards to "lost profits [because they] are frequently the result of several intersecting causes[; therefore, it must] ... be shown with a reasonable degree of certainty that the defendant's breach *caused* a specific portion of the lost profits." *Id.* (emphasis added). Prior profits provide a baseline against which the postbreach situation may be measured to arrive at a reasonably certain calculation of lost profits. *Stuart Park Assocs.*, 846 F.Supp. at 715.

On the other hand, it would be unjust to effectively immunize a defendant whose very breach prevents a new business from growing. *See Vendo Co. v. Stoner*, 58 Ill.2d 289, 321 N.E.2d 1, 13 (Ill.1974); *Schatz v. Abbott Labs., Inc.*, 51 Ill.2d 143, 281 N.E.2d 323, 325–26 (Ill.1972).

## A. Out–of–Pocket Expenses and Mr. George's Time

Regarding out-of-pocket expenses, RVC produced a multi-page worksheet itemizing expenses and documentation, such as receipts, upon which Mr. George relied in drafting the worksheet. USAir points out and Mr. George agrees that he did not retain documentation for every expense on the worksheet and made several errors in his calculations. Given these facts, RVC may ultimately recover less than it wishes.[13] Still, the "evidence need only tend to show a basis for the computation of damages with a fair degree of probability," *LeFevour*, 166 Ill.Dec. at 700, 586 N.E.2d at 658, and "a plaintiff is not required to propose a specific damages figure to a jury." *Olympia Hotels Corp.*, 908

---

12. The parties debate whether or not Illinois recognizes a "rule" that new or unprofitable businesses are not entitled to recover lost profits. Avoiding labels, I will concern myself with the practical reality.

13. RVC claims that it incurred between $180,-000.00 and $200,000.00 in out-of-pocket expenses. (Def.'s 12(M) Reply ¶ 119).

F.2d at 1372. RVC has presented "evidence [which will] enable [a] jury to come up with a figure that represents a reasonable estimate of the plaintiff's [out-of-pocket expenses] damages." *Id; see also Illinois Structural Steel Corp. v. Pathman Constr. Co.*, 23 Ill. App.3d 1, 318 N.E.2d 232, 236 (1st Dist.1974) (party's own testimony regarding breach of contract damages, supported by records, was not speculative).

As for the value of Mr. George's lost time, RVC's evidence consists of Mr. George's testimony that he spent "substantially all [his] time" on the project involving USAir certificates. Mr. George, however, could remember the names of only a few potential promotion customers that he contacted during these years. He named only one customer, Investors Guarantee, Inc., with whom he actually reached an agreement to use the USAir certificates. Mr. George testified he was "sure" he had made telephone calls to realtors, attorneys and mortgage companies, but could not remember how many calls were made. He could recall the name of only one title insurance company that he called, apart from Investors Title, and said only that he called three of these companies. Mr. George similarly could recall the name of only one mortgage company and one property management company with whom he says he spoke concerning a promotion program using USAir certificates.

USAir argues presumably that there is no basis to support Mr. George's claim of $500,000 in lost time. Mr. George has never made $500,000 in any given three-year period. *Id.* Furthermore, Mr. George has not provided evidence regarding what his time might be worth or whether RVC could even have compensated him. Nevertheless, he undoubtedly spent some time on this project and he is entitled to have the jury determine a value for that time.

**B. *Lost Profits from Real Estate Promotions***

■ On July 31, 1992, RVC entered into a four-year contract with Investors Title Guarantee, Inc. ("ITG"). (Def.'s 12(M) Reply ¶ 60); (Def.'s App. to 12(M) Statement, Ex. 38). ITG's clients, attorneys, realtors, and mortgage companies, would receive RVC's so-called TRIP$ certificates and offer them to their clients. The ultimate consumers would redeem the TRIP$ certificates through RVC, which would use the USAir certificates in the ticketing process. (Def.'s 12(M) Reply ¶¶ 58, 61.) RVC sold ITG approximately 123 TRIP$ certificates. (Def.'s 12(M) Reply ¶ 74.) RVC claims that had USAir delivered the certificates it promised, RVC would have been able to sell 200 TRIP$ certificates to ITG per month.[14] (12(M) Reply ¶¶ 218–220). The only evidence for this figure is Mr. George's testimony that the parties estimated that ITG would use 200 USAir certificates each month. Mr. George's estimate, without more, is too speculative to go to a jury.

RVC also claims that had USAir delivered the certificates it promised, RVC would have concluded contracts with three to five additional title companies each year, captured two to three percent of the homeseller/realtor promotion market, and sold 5,000 TRIP$ certificates annually in mortgage-related promotions.[15] The only evidence that these deals did not go through due to USAir's breach is Mr. George's testimony that he spoke to numerous individuals in these various industries and they expressed a desire to purchase travel certificates with few restrictions. But, Mr. George could remember the name of only one title insurance company aside from ITG that he actually spoke with about promotions, and it chose not to do business with Mr. George. Additionally, Mr. George could not recall any geographic location other than Indianapolis that would be receptive to his travel incentive promotions. Mr. George also could not remember the names of any real estate companies or real estate agents he spoke to regarding promotions. He also could remember the name of only one property management

---

**14.** This transaction would have generated a profit of $1,659,200 (four years times $414,800.00 annual profit).

**15.** RVC also claims that it would have done successful apartment leasing promotions but cannot presently calculate the relevant profits. (Def.'s 12(M) Reply ¶ 94.)

company he spoke with regarding apartment leasing promotions using USAir travel certificates. Mr. George has indicated nothing will refresh his recollection about the companies he spoke to regarding promotions.

Without more, a reasonable fact finder could not infer that the reason RVC was unable to sell more TRIP$ certificates to ITG or to conclude contracts with other entities was USAir's failure to provide the certificates described in the agreement. *See Midland Hotel,* 113 Ill.Dec. at 257, 515 N.E.2d at 66 ("[S]ince lost profits are frequently the result of several intersecting causes, it must be shown with a reasonable degree of certainty that the defendant's breach caused a specific portion of lost profits.").

### C. Lost Profits from Supermarket Promotions and USAir's Motion to Strike RVC's Expert Witness.[16]

 Mr. George believes RVC could have done numerous retail food and drug promotions if USAir had delivered the agreed upon certificates. To prove this, RVC hired Dr. Robert Olley to provide an expert report on the profits RVC could have earned under its contract with USAir. Dr. Olley reported that RVC would have earned $9.8 million per year in supermarket promotions if USAir had tendered conforming certificates to RVC. USAir moves to strike Dr. Olley's testimony as deficient under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). USAir also argues that, even with Dr. Olley's testimony, USAir did not cause RVC's injury and RVC's damages are speculative.

RVC's claim for supermarket promotion damages suffers from the same causation deficiencies as its claim for real estate promotion damages. The burden rests on RVC to show "with a reasonable degree of certainty that the defendant's breach caused a specific portion of lost profits." *Midland Hotel,* 113 Ill.Dec. at 257, 515 N.E.2d at 66. Mr. George estimates that RVC could have done ten retail food and drug promotions per year had USAir supplied conforming certificates. Mr. George, however, has no prior experience in food store promotions and provides no reasonable basis for his estimate.

Furthermore, Mr. George only had serious negotiations concerning a possible food store promotion with Alan Stec, the founder and president of a company that provides strategy and tactics for food retailers. Mr. George and Mr. Stec discussed a promotion that would have involved RVC, USAir, and Kash 'N Karry food stores. Mr. George and Mr. Stec never consummated this promotion deal. According to Mr. Stec, the promotion fell through for a variety of reasons: 1) Mr. George insisted on going first to Kash 'N Karry with the promotion idea before getting USAir involved, 2) Mr. George's insistence on going to Kash 'N Karry first made it impossible to get all three parties together on a contractual basis, and 3) Mr. Stec believed a Letter of Agreement drafted by Mr. George would have prohibited Mr. Stec from working on promotions in the food retail business for several years. (Stec Dep. at 47–49, 52–54). RVC has offered no evidence that it was attempting to or could have used USAir travel certificates in other supermarket promotions.

It may be that, as argued by RVC, since the USAir certificates lacked the restrictions standard in the airline industry, they were an attractive commodity. Without more, however, a jury could not find that the reason RVC was unable to engineer supermarket promotions or conclude a contract with Mr. Stec was USAir's failure to provide the certificates described in the agreement. RVC has failed to offer any evidence from which a jury could find that RVC had met its burden of proving causation of lost profits to "a reasonable degree of certainty."

 Even assuming causation, RVC's expert does not pass muster under *Daubert.* The proponent of proffered expert testimony

---

16. Since the issue of RVC's lost profits from supermarket promotions and USAir's motion to strike RVC's expert on damages are interrelated, I will consider them together. *Chamberlain Mfg. Corp. v. Maremont Corp.,* No. 92–0356, 1995 WL 103803 at *10 (N.D.Ill. Mar.6, 1995); *Prime Leasing, Inc. v. Aetna Life Ins. Co.,* No. 93 C 7034, 1994 WL 411726 at *6 (N.D.Ill. Aug.4, 1994); *Resolution Trust Corp. v. Aetna Cas. & Sur. Co. of Ill.,* 831 F.Supp. 610, 612 (N.D.Ill. 1993), *aff'd,* 25 F.3d 570 (1994).

bears the burden of establishing its admissibility by a preponderance of proof. *Bradley v. Brown,* 852 F.Supp. 690, 697 (N.D.Ind.), *aff'd,* 42 F.3d 434 (7th Cir.1994); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1316 (9th Cir.1995) (hereinafter *"Daubert II"*) ("The party presenting the expert must show that the expert's findings are based on sound science."). In determining whether RVC has met its burden in this case, the Court is guided by Federal Rule of Evidence 702 [17] and its construction by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

An expert opinion that is not supported by a scientifically reliable methodology is not admissible under Federal Rule of Evidence 702. *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795. Courts must take their role as "gatekeeper" seriously and exclude "subjective belief or unsupported speculation." *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 614 (7th Cir.1993) (citing *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795; *see also Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir. 1996)("[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist.").

While Dr. Robert Olley certainly has sufficient credentials, the expert evidence he purports to offer in this case is unscientific speculation that will not be beneficial to the trier of fact. He has not studied the profitability of promotional agencies in actual supermarket promotions (Olley Dep. at 108), and did not do an analysis of the demand for supermarket promotions in USAir's markets. (Olley Dep. at 173). Dr. Olley nevertheless assumes that RVC would have entered into ten supermarket promotions a year using USAir certificates. His only source for this assumption is Mr. George, who, by his own admission, has no experience in supermarket promotions. (12/7/95 George Dep. at 146).

Dr. Olley concluded that the average profit RVC would earn for each travel certificate redeemed was $30. Dr. Olley's conclusion again was based only on Mr. George's estimate of $30 in profit per certificate redeemed. (Olley Dep. at 182). Dr. Olley did not compare the discounts Mr. George used in calculating the $30 number with actual discounts used in prior, successful promotions (Olley Dep. at 187–88). Indeed, he acknowledged he knew of no empirical evidence to back up the $30 estimate (Olley Dep. at 195).

The same problems occur with Dr. Olley's opinion as to the percent of people using discounted travel certificates who would purchase an additional companion ticket. Mr. George decided 30% of those purchasing certificates would purchase a companion ticket. (Pl.'s 12(N) Statement of Add. Facts ¶ 228). Dr. Olley believed it "seem[ed] reasonable that [Mr. George's estimate] might be [correct]." (Olley Report at 6). Still, Dr. Olley testified he was aware of no empirical evidence to back up Mr. George's estimate of 30%. (Olley Dep. at 195). It appears Dr. Olley's analysis of this number is his belief that "Mr. Jones isn't likely to go off to Florida without taking Mrs. Jones or vice versa...." (Olley Dep. at 194). Dr. Olley testified that the 30% figure accorded with what he had seen when consumers buy automobiles and recreation vehicles, but never stated how these markets are at all analogous to airline ticket promotions at supermarkets. (Olley Dep. at 194–95). Dr. Olley's opinions regarding lost profits on supermarket promotions will not assist the trier of fact because they are based on unsupported facts. *See Dana Corp. v. American Standard, Inc.,* 866 F.Supp. 1481, 1499 (N.D.Ind.1994)("Unsupported facts do not provide a sufficient basis from which a reasonable juror could find the expert's opinion more certain or reasonable."). Accordingly, the motion to bar this testimony is granted.

Without Dr. Olley's opinions, the evidence provided by RVC does not allow a reasonable fact finder to estimate the amount of lost profits for supermarket promotions in this

---

17. Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

case. The only other evidence presented on lost profits from supermarket promotions consists of Mr. George's numbers. But, Mr. George admits he has no experience in supermarket promotions and he has provided no substantiation for his estimates. They are simple speculation. RVC has not presented evidence that would allow a jury to find an award of lost profits from supermarket promotions "with a fair degree of probability."

### Fraud

■■ USAir moves for summary judgment on the fraud count in RVC's complaint. RVC claims that USAir knew shortly after entering the original agreement set forth in the July 30, 1991 letter that it would not tender conforming travel certificates to RVC and that USAir entered into the First Amendment and Second Amendment with no intention of fulfilling the obligations stated in the Amendments. Instead, RVC alleges, USAir was attempting to stall the start of litigation and hopefully exhaust RVC's resources to avoid being sued altogether.[18]

■■ As noted earlier, to establish common law fraud RVC must prove USAir knowingly made a materially false statement that RVC properly relied upon to its detriment. *Siegel v. Levy Org. Dev. Co., Inc.*, 153 Ill.2d 534, 180 Ill.Dec. 300, 304, 607 N.E.2d 194, 198 (1992) (citation omitted). The misrepresentation is material "if it relates to a matter upon which the plaintiff could be expected to rely in determining whether to engage in the conduct in question." *Shah v. Chicago Title & Trust Co.*, 119 Ill.App.3d 658, 75 Ill.Dec. 357, 360, 457 N.E.2d 147, 150 (1st Dist.1983).

RVC presents evidence that, shortly after it received the first set of travel certificates, RVC informed USAir that the certificates did not conform to the terms of the original agreement and explained why the certificates were non-conforming. A reasonable fact finder could conclude that, before entering into the First and Second Amendments, USAir was aware RVC found the travel certificates unacceptable and knew exactly what restrictions RVC expected on the travel certificates. USAir entered into Amendments which stated RVC would be provided with certificates that conformed to the terms of the original agreement. Although RVC continually requested conforming certificates from USAir, such certificates were never provided. RVC notes that one USAir employee admitted that she had never seen USAir issue the type of certificate called for by the original agreement.

USAir's promise to provide conforming travel certificates was a material part of all the contracts RVC signed. There is a genuine issue of material fact as to whether USAir entered the First and Second Amendments knowing it would not provide the certificates RVC requested. RVC was justified in relying on USAir's continued promises and RVC's reliance may have led to Mr. George's out-of-pocket expenses. Accordingly, USAir's motion for judgment as a matter of law on RVC's fraud claim is denied.[19]

### Conclusion

For the reasons stated above, RVC's motion for partial summary judgment is granted on the breach of contract claims in its complaint. RVC's motion for summary judgment is also granted on USAir's coun-

---

**18.** RVC concedes USAir did not enter into the original agreement with fraudulent intent. (Pl.'s 12(N) Statement of Add. Facts ¶ 172). Additionally, although stated in its complaint, RVC does not forward any argument that USAir committed fraud in connection with allowing RVC use of USAir's name and logo in promotions. This argument is thus waived.

**19.** USAir argues that "[a] change of mind can be a breach of contract...but it is not a fraud." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992). While this is undoubtedly true, RVC is not claiming that USAir entered each Amendment intending to honor it and then decided to

breach. RVC argues that USAir had no intention of honoring the Amendments when they were signed. USAir is also correct in that "a promise to perform a future act, even though made without a present intention to perform, is generally insufficient to constitute fraud." *Magnuson v. Schaider*, 183 Ill.App.3d 344, 131 Ill.Dec. 753, 765, 538 N.E.2d 1309, 1321 (2d Dist.1989). USAir neglects to note there is an exception to this rule "where the false promise to do something in the future is the scheme or device used to accomplish the fraud." *Id.* The exception applies to the case at hand.

terclaims for fraud and rescission. USAir's motion for summary judgment is granted regarding RVC's lost profits claims for real estate-related promotions, and lost profits for supermarket-related promotions. USAir's motion for summary judgment is denied regarding Mr. George's out-of-pocket expenses, lost time and on RVC's fraud Count. USAir's motion to strike RVC's expert witness testimony on damages for lost supermarket promotions is granted.