No. 2--96-1001

_________________________________________________________________

                             IN THE

                  APPELLATE COURT OF ILLINOIS

                         SECOND DISTRICT

_________________________________________________________________

FIRST MIDWEST BANK, N.A.,       )  Appeal from the Circuit Court 

                      )  of Lake County.

Plaintiff and  )

Counterdefendant-Appellee, )

                           )

v.                              )

                                )

LEE A. SPARKS,                  )

                                )

Defendant                  )  No. 90--L--224

                                )

(Thomas P. Stepanich, Defendant ) 

and Counterplaintiff-Appellant, )

v. Thomas Schwartz; Paul        )

Bouchard; First Midwest Bank    )  Honorable       

Holding Company, Counter-       )  Michael J. Sullivan,

defendants-Appellees).          )  Judge, Presiding.              _________________________________________________________________

   JUSTICE THOMAS delivered the opinion of the court:

The plaintiff, First Midwest Bank (the Bank), filed this lawsuit against the defendants, Lee A. Sparks and Thomas P. Stepanich, to recover for sums loaned to Sparks.  In connection with the transaction, Stepanich cosigned the loan documents on behalf of Sparks.  Stepanich filed a counterclaim against the Bank and two of the Bank's employees, Thomas Schwartz and Paul Bouchard, alleging common-law fraud and violations of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 
et
 
seq
. (West 1994)).  He also sought rescission of the loan document.  Following a jury trial on the Bank's claim, the trial court entered judgment in favor of the Bank and against Stepanich in the amount of $81,215, which included attorney fees and costs.  The trial court granted Stepanich's 
motion 
for a bench trial on his counterclaims of consumer fraud and rescission.  After hearing the evidence on those claims, the trial court entered judgment in favor of the Bank.  Stepanich appeals.

FACTS

The record shows that Schwartz was the president of the First Midwest Bank in Waukegan on August 1, 1989.  On that day, Sparks, a licensed attorney, came to the Bank and asked to borrow $48,000. Schwartz informed Sparks that he was not in a position to make the loan on an unsecured basis.  Sparks mentioned the possibility of having Stepanich cosign.  Stepanich was also a licensed attorney practicing in the area.  Schwartz indicated that he was familiar with Stepanich's financial condition and that he would accept him as a cosigner.

Later that day, Sparks informed Schwartz that Stepanich would be a cosigner.  As Schwartz prepared the note, Stepanich and Sparks sat together in a conference room.  When Schwartz presented the note, Stepanich complained to Sparks that the amount of $48,000 listed in the note was not what he had agreed upon.  Stepanich and Sparks then agreed on the amount of $27,516.21, and Schwartz then left the room to prepare a note for that amount.

At the time of the August 1, 1989, loan, Sparks had other loans with the Bank either through the Waukegan or Zion branch.  On February 27, 1987, through the Waukegan branch, Schwartz loaned Sparks $32,000.  By February 1989, the principal had been reduced to under $15,000 and the loan was renewed for another three months.

On April 1, 1989, Bouchard, vice-president of the Zion branch of the Bank, made a $36,838.09 loan to Sparks, which was disbursed to him early in May 1989.  Part of the reason for the loan was that Sparks was overdrawn for 21 days on an account by $27,068.96.  The loan was secured by a third mortgage on Sparks' home.  The Bank did not do an appraisal of the home before approving the loan even though typical lending guidelines provided that an appraisal be done.  Bouchard did not see a current financial statement or a tax return of Sparks before making the loan and did not know Sparks' income.  Sparks apparently had a financial statement dated February 27, 1987, which listed his income as $84,000 and his net worth at $364,000, but Bouchard did not recall seeing that statement.

On May 8, 1989, the Bank loaned Sparks $29,214.27, for 30 days, to cover a real estate transaction that Sparks was involved with in the State of Wisconsin.  The loan was made with Schwartz' approval.

On May 15, 1989, the Bank made another loan to Sparks of $48,029.91, due 30 days from the date of the loan.  This loan was apparently made through Bouchard.  Bouchard acknowledged that he could not rely on the intended payoff source of this loan which was to be certain CDs held by Isabel M. Graf, over which Sparks had the power of attorney.  Bouchard stated that Sparks gave him copies of the CDs belonging to Graf, which were on deposit at the Bank in the amount of $104,000.  Bouchard told Sparks that the Bank could not make the loan without additional collateral.  The Bank finally agreed to loan Sparks the money after Sparks got Bill McCullough to guarantee it.  Bouchard noted that he was unaware of the May 8, 1989, loan through the Zion branch when he made the loan on May 15, 1989.

Thereafter, Sparks did not pay any of his loans on time.  On June 30, 1989, Sparks wrote a check from his checking account to the Bank against the April 1, 1989, and May 15, 1989, loans.  Because of insufficient funds in Sparks' checking account, the check did not clear.  Because Sparks had deposited nearly $80,000 in his checking account during June, he did have some funds available to pay down his loans.  So, at Sparks' request, $38,084.79 was used to completely pay off the April 1, 1989, loan, and $20,292.10 was used to pay down the May 15, 1989, loan.

On July 21, 1989, Bouchard wrote a letter to Paula Wix, the vice-president of the loan review function of the Bank, requesting that she rerate Sparks' loans as problem loans.  He stated in the letter that "[t]hrough recent broken promises, it is apparent Sparks has financial problems which has [
sic
] not allowed him to payoff [
sic
] our note having a balance of $27,737.81."  Bouchard further stated in the letter that he was working with Schwartz to resolve the problem, since Sparks had loans at the Waukegan office.  Bouchard testified, however, that he did not recall having a conversation with Schwartz even though his letter might have indicated that he did.  Schwartz was not copied on the letter but did receive a faxed copy on August 4, 1989.

Wix reviewed Sparks' loans at the Bank.  As of July 27, 1989, he had a total of five loans with the Bank, three in Zion and two in Waukegan, and all of the loans were delinquent.  She noted that because a loan was delinquent did not mean that it was a bad loan or that it was in default.  She explained that she undertook a review of Sparks' accounts after reviewing trial balances.  At that time, she happened to notice that there were loans on the Waukegan trial balance and the Zion trial balance with similar names.  After further investigation, she found that the loans were made to the same person, Sparks.  She noted that it was possible that one branch might not know what the other branch is doing from time to time.  After she received Bouchard's letter to rerate the loans, she talked to Schwartz on the phone about the loans made through the Waukegan branch.  She testified that she did not recall discussing any of the loans made through the Zion branch with Schwartz.  Schwartz told her that he was quite confident in his borrower and that the loans would be repaid.  After she talked with Schwartz and concluded her review, Wix reaffirmed Sparks' Waukegan branch loans at a rating of 4, which was an average loan rating.

Stepanich testified that, aside from Billy McCullough, Sparks was his best friend.  Stepanich also noted that Schwartz was a close friend of his and he trusted Schwartz.  Stepanich stated that he did not know anything about Sparks' financial condition other than he always seemed to have plenty of money.  On the day Sparks asked him to cosign, Sparks told Stepanich that as a result of giving a check to someone who cashed it prematurely he needed some more money.  He further stated that if he had known Sparks' financial condition at the time of the August 1, 1989, loan he would not have agreed to cosign.  He acknowledged that he never inquired of Schwartz about Sparks' financial condition and that he understood that the Bank would not lend Sparks the money unless he cosigned.  

Stepanich further testified that when the note became due around September 30, 1989, Schwartz informed Stepanich that they were unable to collect from Sparks and since Stepanich had cosigned he was liable to make payment on the note.  According to Stepanich, Schwartz told him that "it looks like [Sparks] has some real problems."  Stepanich then asked, "Why didn't you tell me that before if you knew about it."  Schwartz replied, "Well, I thought you would ask Sparks about it."

Schwartz testified that when he made the August 1, 1989, loan he had no reason to believe that Sparks did not have the ability to repay the loan.  He stated that he did not know that the Zion branch of the Bank had made the April 1, 1989, and May 15, 1989, loans to Sparks.  He further stated that he did not remember ever talking to Bouchard about Sparks having financial problems.  He did not see Bouchard's letter to Wix until August 4, 1989, after the loan was made.

CONSUMER FRAUD ACT CLAIMS

On appeal, Stepanich first argues that the trial court erred in entering a judgment on behalf of the Bank on his Consumer Fraud Act and common-law fraud claims.  With respect to his consumer fraud claim, he points out that, unlike common-law fraud, actual reliance is not an element of a Consumer Fraud Act claim.  He notes that, in denying his post trial motion, the trial court found that he had failed to prove actual reliance.

To establish a deceptive practice claim, a plaintiff must allege and prove:  (1) the misrepresentation or concealment of a material fact; (2) an intent by the defendant that the plaintiff rely on the misrepresentation or concealment; and (3) the deception occurred in the course of conduct involving trade or commerce.  815 ILCS 505/2 (West 1994); 
Dwyer v. American Express Co.
, 273 Ill. App. 3d 742, 749 (1995); 
Siegel v. Levy Organization Development Co.
, 153 Ill. 2d. 534, 542 (1992).  Concealment is actionable where it is employed as a 
device to mislead and the concealed fact must be such that had the other party been aware of it, he would have acted differently.  
Buechin v. Ogden Chrysler-Plymouth, Inc.
, 159 Ill. App. 3d 237, 248 (1987).  The statute does not require actual reliance.  
Siegel
, 153 Ill. 2d at 542.

Given that our supreme court has stated that actual reliance is not an element of a Consumer Fraud Act claim, we find that the trial court erred in finding that Stepanich was required to prove actual reliance.  However, we further find that the error does not change the outcome here.  The trial court's decision can be affirmed on any basis appearing in the record (
Hoffer v. School District U-46
, 273 Ill. App. 3d 49, 59 (1995); 
McDermott v. Metropolitan Sanitary District
, 240 Ill. App. 3d 1, 28 (1992)), and we find that there are other grounds supporting the correctness of the court's decision.

CONFIDENTIALITY EXCEPTION

In that regard, we note that the Bank initially contends that the Consumer Fraud Act does not apply because its activity in not disclosing Sparks' financial condition was within the scope of an exception created by the Consumer Fraud Act.  The exception relied upon by the Bank is found by combining section 10b of the Consumer Fraud Act and section 48.1 of the Illinois Banking Act (205 ILCS 5/48.1 
(West 1994)).  Section 10b(1) of the Consumer Fraud Act provides:

"Nothing in this Act shall apply to:

 (1) Actions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States."  815 ILCS 505/10b(1) (West 1994).

Section 48.1(c)(1) of the Illinois Banking Act provides in relevant part:

"A bank may not disclose to any person, except to the customer or his duly authorized agent, any financial records relating to that customer of the bank unless:

(1) the customer has authorized disclosure to that person[.]"  205 ILCS 5/48.1(c)(1) (West 1994).

We agree that the Bank's alleged failure to disclose
 Stepanich's financial condition was authorized by the Illinois Banking Act and was thus within the scope of the exception to the Consumer Fraud Act.  The court in 
Aurora Firefighter's Credit Union v. Harvey
, 163 Ill. App. 3d 915 (1987), faced a similar issue.  There, the defendant guaranteed a note.  When the primary  obligor defaulted, the credit union filed suit to collect from the defendant.  The defendant raised an affirmative defense and a counterclaim based on the Consumer Fraud Act, alleging that the credit union failed to make certain disclosures.  In response, the credit union argued that it was not required to make the disclosures, citing section 10b of the Consumer Fraud Act and a provision of the federal Truth in Lending Act stating that a creditor need not disclose to more than one obligor if disclosure is given to the primary obligor (15 U.S.C.A. §1631(a) (West 1982)).  The 
Harvey
 court agreed with the credit union that it was not required to make a more extensive disclosure than that prescribed in the Truth in Lending Act.  
Harvey
, 163 Ill. App. 3d at 923.  Similarly, we find that the Bank was not required to disclose Sparks' financial condition where the Illinois Banking Act specifically prohibited such disclosure.

Stepanich contends that the exception does not apply, citing section 124(1) of the Restatement of Security, the comments thereto (Restatement of Security §124(1), Comment 
d
 (1941)) and the out-of-state authority of 
First National Bank & Trust Co. v. Notte
, 97 Wis. 2d 207, 293 N.W.2d 530 (1980).  In 
Notte
, the court adopted the restatement disclosure rule stating:

" 'Where before the surety has undertaken his obligation the creditor knows facts unknown to the surety that materially increase the risk beyond that which the creditor has reason to believe the surety intends to assume, and the creditor also has reason to believe that these facts are unknown to the surety and has a reasonable opportunity to communicate them to the surety, failure of the creditor to notify the surety of such facts 
is a defense to the surety.
' " (Emphasis added.)  
Notte
, 97 Wis. 2d at 217, 293 N.W.2d at 536, quoting Restatement of Security §124(1) (1941).

The 
Notte
 court then addressed the banking industry's concerns about protecting a customer's expectation of privacy in financial records by relying on the comments to section 124(1) of the Restatement of 
Security and stating:

"When disclosure of a material fact to a proposed surety would violate a duty imposed on the creditor by law, the creditor cannot accept the surety obligation.  'The mere fact that the creditor should not disclose information should not enable him to take advantage of the information to the detriment of the surety.'  Restatement of Security, §124(1), Comment d (1941).  Non-disclosure can form the basis for a misrepresentation sufficient 
to allow the avoidance of a contract obligation
 under general principles of contract law.  [Citation.]  The rule announced today is merely a special application of the more general non-disclosure rules 
for contract avoidance.
"  (Emphasis added.)  
Notte
, 97 Wis. 2d at 219, 293 N.W.2d at 536-37, quoting Restatement of Security §124(l), Comment 
d
 (1941).

We find it clear from a careful reading of the restatement and the 
Notte
 case that nondisclosure is a 
defense
 to the surety
 in a 
breach of contract
 action brought by the creditor.  In such a case, the creditor cannot use confidentiality to invalidate the surety's defense to a breach of contract action.  Stepanich has cited no authority and we are not aware of any which would prohibit a creditor from employing the statutory nondisclosure exception as a defense to a surety's Consumer Fraud Act claim.  We find unpersuasive Stepanich's argument that the exception for nondisclosure was designed to protect Sparks and therefore it should not apply to the creditor's defense of consumer fraud.  Stepanich's proposition would place the Bank in the position of having to choose between being sued by the primary obligor or the surety.  The fact that the creditor is not allowed to take advantage of the confidentiality rule to the detriment of the surety does not eradicate the creditor's defense to consumer fraud but merely allows the surety to avoid contractual obligations in the proper case.  Accordingly, we find that the Bank properly raised this as a defense to Stepanich's counterclaims pursuant to the Consumer Fraud Act.

MERITS OF CONSUMER FRAUD CLAIM

The trial court's judgment in favor of the Bank on the Consumer Fraud Act counts is supported by the additional reason that the record would adequately support a finding that there was no evidence of any intent on the part of Schwartz that Stepanich rely on any concealment.  In that regard, the record contains ample evidence from which it could be concluded that Schwartz did not know about Sparks' financial condition and did not intend for Stepanich to rely on any alleged omissions.  Schwartz testified that he believed that Sparks had the ability to pay the loan amount, he did not know about Sparks' other loans at the Zion branch, and did not see Wix' letter until after Stepanich had cosigned.  Moreover, since he knew Stepanich and Sparks were such good friends and Stepanich did not inquire from Schwartz about Sparks' financial condition, Schwartz could have reasonably concluded that Stepanich was informed by Sparks of all the material facts surrounding the transaction.

COMMON-LAW FRAUD CLAIM

We also find that Stepanich's fraud claim was properly rejected.  In order to prove fraud by the intentional concealment of a material fact, it is necessary to show the existence of a special or fiduciary relationship, which would raise a duty to speak.  
Magna Bank v. Jameson
, 237 Ill. App. 3d 614, 618 (1992).  As a matter of law, the relationship between a guarantor and creditor is not such a relationship.  
Jameson
, 237 Ill. App. 3d at 618.  Moreover, a creditor is entitled to assume that the surety is aware of all material facts.  
Jameson
, 237 Ill. App. 3d at 618.  Under similar facts, the court in 
St. Charles National Bank v. Ford
, 39 Ill. App. 3d 291 (1976), set forth the criteria for assessing a claim by the surety that he was misled by the creditor as follows:

"If the creditor knows that the surety is acting on a belief that there are no unusual circumstances by which his risk is materially increased, whereas to the knowledge of the creditor, there are such circumstances, and he has opportunity to make them known, good faith and fair dealing demand that there should be full disclosure if the surety is to be held liable.  [Citation.]  But while the obligee must act in entire good faith, the surety has no right ordinarily to rely for information upon the obligee's duty to make disclosure of all the facts affecting the risk, 
but must himself make inquiry.
  Particularly, in cases, as here, in which the surety assumes the risk at the debtor's request, rather than at the creditor's, the creditor may reasonably assume that the surety will acquire from the debtor himself all information which it reasonably believes to be relevant to the risk.  (Emphasis in original.)  
Ford
, 39 Ill. App. 3d at 295-96.

Applying the above-mentioned criteria, we conclude that the trial court properly found in favor of the Bank on Stepanich's fraud claim.

BANK'S CLAIM       

We next address the question of whether the trial court erred in denying Stepanich's motion for a judgment notwithstanding the verdict in favor of the Bank on its contract claim.

It is well settled that judgments 
n.o.v.
 should be entered only in those cases in which all the evidence, when viewed in the aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand.  
Pedrick v. Peoria & Eastern R.R. Co.
, 37 Ill. 2d 494, 510 (1967); 
E.J. McKernan Co. v. Gregory
, 252 Ill. App. 3d 514, 543 (1993).  

Here, after viewing the evidence most favorably to the Bank, we find that the jury's verdict was amply supported by the evidence.  Stepanich's defense to the Bank's claim centered around the Restatement of Surety standard as enunciated in 
Ford
 and 
Notte
:   "If the creditor knows that the surety is acting on a belief that there are no unusual circumstances by which his risk is materially increased, whereas to the knowledge of the creditor, there are such circumstances, and he has opportunity to make them known, good faith and fair dealing demand that there should be full disclosure if the surety is to be held liable."  
Ford
, 39 Ill. App. 3d at 295.  

See also 
Notte
, 97 Wis. 2d at 217, 293 N.W.2d at 535-36.  Again, in the instant case, Schwartz stated that he did not know about Sparks' other two loans at Zion and that he felt Sparks had the ability to repay.

Nonetheless, Stepanich contends that the Bank is charged with knowledge since other agents at other branches of the Bank had knowledge of Sparks' credit history.  While Stepanich cites a generally true proposition of law, it cannot be mechanically applied here.  The key question is what Schwartz 
knew on August 1, 1989, since he was the one responsible for making the loan.  But, regardless of whether knowledge could be imputed to the Bank through one of its officers, Stepanich had the burden of proving that the Bank had reason to believe that facts relating to the risk to be undertaken were unknown to Stepanich.  There is no evidence that the Bank or any of its agents possessed such knowledge.  In fact, it was reasonable for the Bank to assume that Stepanich possessed all the facts materially affecting the risk in view of Sparks and Stepanich's friendship.  As the court noted in 
Notte
, "there is no duty imposed on a creditor to conduct an investigation for the surety regarding the risk to be undertaken.  Therefore, if the creditor is nothing more than negligent in not discovering facts which affect the risk the surety will not be discharged of his obligation."  
Notte
, 97 Wis. 2d at 217, 293 N.W.2d at 536.  The precise degree of knowledge possessed by the parties may be difficult to ascertain and is a question for the trier of fact.  
Notte
, 97 Wis. 2d at 217, 97 N.W.2d at 535.  Accordingly, we find that the trial court properly refused to disturb the jury's determination on this issue.

BANK'S JURY INSTRUCTION NO. 28

Next, Stepanich argues that the trial court erred in giving the Bank's instruction No. 28.  The instruction set forth the exception in section 48.1 of the Illinois Banking Act prohibiting the disclosure of a customer's financial records unless authorized by the customer.  The instruction then stated that "[i]f you decide the counterdefendant complied with the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, the counterdefendant was negligent or committed fraud at the time of the occurrence."  Stepanich argues that this instruction was contrary to his instruction No. 5 about the duty of the Bank to disclose information and his instruction No. 17 that the mere fact that the creditor should not disclose information because it is confidential should not enable the creditor to take advantage of the information to the detriment of the surety.

 Stepanich's argument ignores the fact that his instructions related to his affirmative defense.  As previously discussed, those instructions relate to a surety's defense in a breach of contract claim.  On the other hand, the Bank's instruction No. 28 related to the Bank's defense of Stepanich's counterclaim.  We find that the instructions clearly state this difference and did not render Stepanich's instruction meaningless.  Accordingly, the Bank's instruction was properly given to the jury and Stepanich's argument must be rejected.

OTHER JURY INSTRUCTIONS

Stepanich also argues that the trial court erred in giving certain other jury instructions tendered by the Bank and refusing to give others that he offered.  We find no merit to Stepanich's contentions.  Accordingly, they must be rejected.

MOTIONS 
IN LIMINE

Stepanich next argues that the trial court erred in not granting his motions 
in
 
limine
 to prevent the Bank (1) from mentioning to the jury that Stepanich had a duty to investigate or use due care; and (2) from claiming the defense of confidentiality of a borrower's records.

Regarding the motion to preclude mention of the duty to investigate, we find no error in the denial of that motion.  As previously stated, Stepanich's duty to investigate and use due care was relevant to the Bank's defense of Stepanich's fraud claim.  See 
Jameson
, 237 Ill. App. 3d at 619-20; 
Ford
, 39 Ill. App. 3d at 295-96.  Likewise, we find that the court did not err in refusing to prevent the Bank from mentioning the defense of confidentiality of a borrower's records as it was relevant to the fraud claim.  See 
Northern Trust Co. v. VIII South Michigan Associates
, 276 Ill. App. 3d 355, 364 (1995).

ATTORNEY FEES

Lastly, Stepanich argues that the award of attorney fees must be reversed claiming that it was based on speculation and conjecture.

We disagree.  A petition for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rate charged therefor.  
Kaiser v. MEPC American Properties, Inc.
, 164 Ill. App. 3d 978, 974 (1987).  Because of the importance of these factors, it is incumbent upon the petitioner to present detailed records maintained during the course of litigation.  
Kaiser
, 164 Ill. App. 3d at 974.  Once presented with these facts, the trial court should consider a variety of additional factors including whether there is a reasonable connection between the fees and the amount involved in the litigation.  
Kaiser
, 164 Ill. App. 3d at 974.  The decision of the trial court will not be reversed absent a manifest abuse of discretion.  
Exchange National Bank v. Sampson
, 186 Ill. App. 3d 969, 974 (1989).  

Here, the Bank's fee petition was supported by detailed records showing services, by whom they were performed, the time expended, and the hourly rate charged.  The parties stipulated that they were the normal and customary rates paid by the Bank for legal fees during that time.  Additionally, the record showed that this litigation spanned the course of several years and involved affirmative defenses and 11 counterclaims by Stepanich.  McCullough, who was also sued by the Bank, testified that he incurred attorney fees in the amount of $19,000 through December 1991, before any counterclaims had been filed.  Moreover, the $27,997.50 in costs and attorney fees ultimately awarded to the Bank was much less than half of the total attorney fees claimed by the Bank.  Under the circumstances, we are unable to say that the trial court's decision was a manifest abuse of discretion.

                         CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

RATHJE and HUTCHINSON, JJ., concur.