# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 04-2621, 04-2834

PHELPS DODGE CORPORATION,

*Plaintiff-Appellee/Cross-Appellant*,

*v.*

SCHUMACHER ELECTRIC CORPORATION,

*Defendant-Appellant/Cross-Appellee.*

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 4035—**Wayne R. Andersen**, *Judge.*

———————

ARGUED APRIL 11, 2005—DECIDED JULY 15, 2005

———————

Before POSNER, RIPPLE, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.*  Phelps Dodge brought this diver-
sity suit (governed by Illinois law) against Schumacher
Electric Corporation to enforce a guaranty. The district judge
awarded summary judgment to the plaintiff and $372,000 in
damages. The facts were stipulated. Schumacher Electric, a
family-owned corporation, manufactures battery-charging
equipment and electrical transformers. A major input in the
manufacture of these products is copper wire. In 1968,

Albert Schumacher, the company's principal, created Horning Wire Corporation to manufacture copper wire for his company—and also to provide a business for his daughter and her husband, John Horning, who became the co-owners of Horning Wire. Phelps Dodge sold the copper rod required for the manufacture of the wire to Schumacher Electric, but at the latter's request delivered the copper rod to Horning Wire. Beginning in 1971, again at Schumacher Electric's request, Phelps Dodge began selling the copper to Horning Wire directly. To induce Phelps Dodge to thus become a trade creditor of a fledgling company, Schumacher Electric wrote Phelps Dodge that "in connection with our request to Phelps Dodge [to sell to, and therefore bill, Horning Wire rather than Schumacher Electric], this letter will serve as a guaranty by [Schumacher Electric] of the payment of any purchases of copper by [Horning Wire] from [Phelps Dodge]." The letter was signed by a vice-president of Schumacher Electric; his actual and apparent authority to issue the guaranty is not questioned.

Thirty years later, Horning Wire went broke and could not pay Phelps Dodge, which it owed $372,000. Phelps Dodge demanded that Schumacher Electric make good on its guaranty. The latter refused, explaining that it had failed to keep a copy of the guaranty and had forgotten about it. This lawsuit ensued.

Of course Schumacher Electric's carelessness is no defense, as it well knows. It defends instead on the grounds, first, that guaranties that specify no duration expire after a reasonable time, and, second, that in any event Phelps Dodge breached a legal duty to notify Schumacher Electric of any developments, during the time the guaranty was in force, that increased the risk to Schumacher Electric of having to make good on the guaranty or that increased the amount that it might have to make good.

The principle that contracts, including guaranties, that specify no expiration date are terminable without liability after a reasonable time is, like most principles of contract law, a guide to interpretation rather than a flat rule. *Mamerow v. National Lead Co.*, 69 N.E. 504, 507 (Ill. 1903); *Insurance Co. of North America v. Hoyt*, 419 F.2d 1148, 1151 (7th Cir. 1969) (Illinois law); *Monroe Ready Mix Concrete, Inc. v. Westcor Development Corp.*, 439 A.2d 362, 363 (Conn. 1981); *Continental Can Co. v. Lanesboro Canning Co.*, 230 N.W. 121, 122 (Minn. 1930); see *Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233, 1239 (Ill. App. 1995); cf. *Employers Ins. of Wausau v. El Banco de Seguros del Estado*, 357 F.3d 666, 670 (7th Cir. 2004). It reflects the commonsense idea that a party is unlikely to place itself under an obligation that will perdure until the Day of Judgment. See, e.g., *Lehigh Coal & Iron Co. v. Scallen*, 63 N.W. 245, 246 (Minn. 1895). But the principle has only limited application to *continuing* guaranties. A continuing guaranty—one tied to a course of dealing, such as the continuing purchase of copper by Horning Wire from Phelps Dodge—is revocable at any time by the guarantor upon notice to the obligee, *Mamerow v. National Lead Co.*, *supra*, 69 N.E. at 507; *City National Bank v. Reiman*, 601 N.E.2d 316, 322 (Ill. App. 1992); *John Nagle Co. v. Gokey*, 799 A.2d 1225, 1227 (Me. 2002), and a contract that a party can revoke at will protects him from being placed under an obligation of oppressive duration even more effectively than a contract that expires on a specified date.

The only circumstance in which it is necessary or appropriate to interpolate a time limit into a continuing guaranty is where, the course of dealing to which the guaranty was tied having ceased, the guarantor reasonably assumed that the guaranty had lapsed—only to discover that, perhaps many years later, the parties to the course of dealing (Phelps Dodge and Horning Wire) had resumed their dealings.

*Monroe Ready Mix Concrete, Inc. v. Westcor Development Corp.*, *supra*, 439 A.2d at 363-64; see *William R. Hubbell Steel Corp. v. Epperson*, 679 So. 2d 1131, 1132-33 (Ala. Civ. App. 1996). That did not happen here.

Schumacher Electric's alternative ground for rescinding the guaranty is that changes in the relationship between Horning Wire and Phelps Dodge between 1971 and 2001 increased the risk to Schumacher Electric to an extent that justifies regarding those changes as "material." A party who has a guaranty cannot be permitted to increase the risk that the guarantor will have to make good on the guaranty without notifying the guarantor so that he has an opportunity to cancel it or demand modifications. *McLean County Bank v. Brokaw*, 519 N.E.2d 453, 458 (Ill. 1988); *Barrett v. Shanks*, 47 N.E.2d 481, 484 (Ill. 1943); *McHenry State Bank v. Y & A Trucking, Inc.*, 454 N.E.2d 345, 349 (Ill. App. 1983); *Georgia-Pacific Corp., Williams Furniture Division v. Levitz*, 716 P.2d 1057, 1059 (Ariz. App. 1986). This rule is an application of the economic principle, fundamental to insurance, of "moral hazard." This is the idea that a person or firm that is insured against a risk has an incentive, unless blocked by contract or law, to increase that risk if it will increase his income or reduce his costs, since he will get to keep the benefit of the greater risk while the insurer will bear the cost. A guaranty is a form of insurance.

But what the cases say, sensibly enough, is that the increase in risk must be "material"; and what is material depends on what is being insured or guaranteed. If an insurance company agrees to insure the life of a person who it knows is a one-pack-a-day cigarette smoker, and sometime after buying the insurance the insured begins to smoke two packs a day, the insurance company cannot rescind the insurance policy on the ground that the insured has materially increased the insurer's risk, for in the absence of an

explicit provision regulating the amount of the insured's smoking he would not think his rights under the policy were limited to a particular level of smoking. (So neither would he expect a discount if he stopped smoking.)

Likewise it was to be expected that volume, price, interest rate, credit limits, and other terms and conditions in the sales contracts between Phelps Dodge and Horning Wire would fluctuate over the years and that Schumacher Electric would not have to be notified of every fluctuation and its guaranty would not terminate automatically if the fluctuations were normal in the sense of falling within the foreseeable range. Had the company worried that these fluctuations might significantly increase the risk of its having to make good on its guaranty, it could have conditioned the guaranty on Phelps Dodge's sending it copies of the sales contracts with Horning Wire, which were renegotiated annually. It did not do that. It could have capped the guaranty at a specific dollar amount; it didn't do that either. "The guarantors could have limited their undertaking both as to time and amount, had they seen fit to do so, but, from a reading of the guaranty, it would seem that their desire and intention were that both should be unlimited." *Mamerow v. National Lead Co.*, *supra*, 69 N.E. at 507.

The reason Schumacher Electric placed no conditions on its guaranty of Horning Wire's debts to Phelps Dodge was the close family linkage between the Schumacher and Horning firms. That linkage began to fray when the Hornings divorced in 1985 and it frayed further when Albert Schumacher, the family patriarch, died in 1988. At some point his successor at the head of the Schumacher company (his son) should have realized that because the firms had grown apart he might not have good information about the current dealings between Horning and Phelps Dodge. He could have insisted, as a condition of continuing the guar-

anty (which, remember, his company could have revoked at will), that Phelps Dodge send him copies of the annual contracts. He did not do that.

Maybe he didn't do that because he didn't know about the guaranty. That wasn't Phelps Dodge's fault. It wasn't privy to the relations between the Schumacher and Horning companies. Had Phelps Dodge known that Schumacher Electric had forgotten about the guaranty and that if it hadn't forgotten it would have insisted on a renegotiation, Phelps Dodge would have had a duty to warn Schumacher. *First Midwest Bank, N.A. v. Sparks*, 682 N.E.2d 373, 378-79 (Ill. App. 1997); *Magna Bank v. Jameson*, 604 N.E.2d 541, 545 (Ill. App. 1992); *St. Paul Fire & Marine Ins. Co. v. Commodity Credit Corp.*, 646 F.2d 1064, 1073 (5th Cir. 1981); *Logan Bank & Trust Co. v. Letter Shop, Inc.*, 437 S.E.2d 271, 274 (W. Va. 1993); *International Harvester Co. v. Fuoss*, 758 P.2d 649, 652 (Ariz. App. 1988); *Restatement of Security* § 124(2) (1941). That is an implication of the duty of performance in good faith that the common law reads into contracts. But it cannot help Schumacher Electric, because Phelps Dodge didn't know that its guarantor had forgotten about the guaranty. The law would be complicated unnecessarily if the obligee were required to inform his guarantor of an increase in risk merely on the off chance that the guarantor had forgotten the very existence of the guaranty. That would be a duty not of good faith but of paternalism. The law does not go that far. If the obligee knows, he is the lower-cost avoider of the impending train wreck and so has a duty to warn. But if he doesn't know, then the guarantor is an equal- or lower-cost avoider and there is no reason to set in motion the cumbersome and expensive machinery of the law to shift the cost of the mistake to the obligee.

At argument Schumacher Electric's lawyer told us that if we allow this guaranty to be enforced, businesspeople will

be reluctant to give guaranties and an important device for encouraging commercial activity will be impaired. The opposite is true. Guaranties that exist at the whim of judges have little value. A business wouldn't know what it was getting when it got a guaranty. The less protection Phelps Dodge could expect to get from Schumacher Electric's guaranty, the tougher would be the terms that it imposed on Horning Wire—which might therefore have gone broke sooner. The analogy is to letters of credit, which are promises to pay that are absolute and thus independent of the underlying contract and so protect commercial transactions from both buyers' trickery and judges' and jurors' foibles.

Quizzed at argument, Schumacher Electric's lawyer was notably vague on when he thought the guaranty had expired or otherwise terminated—when the "reasonable time" was up or a "material" change in risk had occurred. It would have been easier for Schumacher Electric to have specified limits in the guaranty than for a court to fill in the blanks that the company had left in its eagerness to assist Horning Wire and its confidence that, given the family ties between the firms, it would always know how much risk it was assuming. The indefiniteness of the guaranty was the fault of the guarantor.

Judicial interpolation of missing contractual terms, which is what Schumacher Electric is seeking from us, performs an important economic function. *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 655 (7th Cir. 2004) (Illinois law); *Central States, Southeast & Southwest Areas Pension Fund v. Basic American Industries, Inc.*, 252 F.3d 911, 915-16 (7th Cir. 2001); *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 602 (7th Cir. 1994). Contracts would be thousands of pages long if the parties had to anticipate and provide for every contingency, however remote, that might occur in the course of contractual performance. Better that courts should

stand ready to fill some gaps if and when the parties' relationship breaks down and precipitates litigation. But the sparser the contract (the material portion of the guaranty, which we quoted, consists of one sentence, and not a very long one at that), and the more difficult it is for the courts to devise crisp terms to fill its gaps, the weaker the argument for judicial intervention, and the more likely, therefore, the court is to find that the contract is too indefinite to be enforced. *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991); *Haslund v. Simon Property Group, Inc.*, *supra*, 378 F.3d at 655 (Illinois law); *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995) (same); *Ryan v. Wersi Electronics GmbH & Co.*, 3 F.3d 174, 180-81 (7th Cir. 1993) (same); *Goldstick v. ICM Realty*, 788 F.2d 456, 461 (7th Cir. 1986) (same); *Neeley v. Bankers Trust Co.*, 757 F.2d 621, 628 n. 5 (5th Cir. 1985). This precept is especially compelling in a case in which the party seeking judicial assistance had a cheap, simple, and efficacious self-help remedy: namely, to terminate the contract, without liability, at any time. Schumacher Electric had no justification for seeking the aid of the courts, to the prejudice of Phelps Dodge.

AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*