**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEYS FOR APPELLANT:

**FRED PFENNINGER**
Pfenninger & Associates
Indianapolis, Indiana

**JACK H. FRISCH**
Jack H. Frisch & Associates
Indianapolis, Indiana

ATTORNEY FOR APPELLEES:

**DAVID F. McNAMAR**
McNamar & Associates, P.C.
Indianapolis, Indiana



FILED
Oct 18 2012, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| PROFESSIONAL VETERINARY PRODUCTS, LTD., <br><br> Appellant/Plaintiff/Counter-Claim Defendant, <br><br> vs. <br><br> PHARMAKON LONG TERM CARE PHARMACY, INC. f/k/a LIBERTY EXPRESS SCRIPTS, INC., PAUL ELMER, and VETERINARY INVENTORY SOLUTIONS, INC., <br><br> Appellees/Defendants/Counter-Claimants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  No. 49A02-1110-CC-980 |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Heather A. Welch, Judge
Cause No. 49D12-0710-CC-43004

**October 18, 2012**

**BRADFORD, Judge**

Appellant/Plaintiff/Counterclaim-Defendant Professional Veterinary Products, LTD ("PVP") appeals the trial court's order limiting Appellee/Defendant/Counterclaimant Paul Elmer's personal liability for certain purchases by Appellee/Defendant/Counterclaimant Veterinary Inventory Solutions, Inc. ("VIS") to $3000. We affirm.

## FACTS AND PROCEDURAL HISTORY[1]

PVP is a Nebraska-based company which distributes animal health care products to licensed veterinarians and veterinary hospitals. VIS was an Indiana corporation that was organized to supply medical products to veterinary hospitals and veterinarians by a computerized inventory control system. Ordinarily, PVP would require that customers hold a veterinary license, but a special exception was made for VIS, which did not hold a veterinary license. In light of this special exception, VIS was allowed to order directly from PVP.[2] VIS was solely owned by Stuart Reed and was led by Brad Sandler, who served as VIS's president.

Elmer was the president of Liberty Express Scripts ("LES").[3] LES is a long-term care pharmacy that is licensed under Indiana law as a pharmacy for supplying drugs to persons in

---

[1] We heard oral argument in this matter on September 6, 2012, and wish to thank counsel for their presentations.

[2] In order to satisfy the requirement that the buyer hold a veterinary license, PVP's management arranged for a San Jose, California veterinarian to be the designated veterinarian for VIS.

[3] LES is now called Parmakon Long Term Care Pharmacy ("Parmakon"). However, because Parmakon was called LES at all times relevant to this appeal, we will continue to refer to it as LES.

long-term care facilities, *i.e.*, nursing homes. Elmer originally believed that he was a stockholder in VIS, but subsequently learned that he was not. Sandler was never employed by nor had any involvement with LES.

At some point prior to May 5, 2006, Elmer visited PVP's company headquarters with Sandler. While at PVP, Elmer and Sandler met with Lionel Riley and Steve Price of PVP. Sandler, in his representative capacity of VIS, was contemplating initiating a business relationship with PVP and asked Elmer to join him on the tour of PVP's facilities.

In order to help VIS get up and running, Elmer agreed, in his capacity as president of LES, to submit a credit application to PVP on May 5, 2006, so that VIS could order product on credit from PVP. This was necessary because VIS, a relatively new company, did not have an adequate credit history to open a credit-based account with PVP. Elmer and Sandler filled out the credit application in LES's name so that VIS could begin ordering product from PVP. LES never had any intention of purchasing product from PVP.

On May 9, 2006, PVP notified Elmer and LES that its credit application had been approved and that LES was given an initial credit limit of $1000. PVP informed Elmer and LES that it could increase LES's credit limit to $3000 if LES opted to use PVP's direct payment option. In response to PVP's offer of the increased $3000 credit limit, Elmer submitted a direct payment authorization.

On or about May 10, 2006, a personal guaranty was also submitted to PVP. Sandler testified that he, not Elmer, filled out the personal guaranty and that he used Elmer's

3

signature stamp on the guaranty.[4]  The guaranty did not explicitly mention LES or VIS or contain LES's PVP account number.  Instead, the personal guaranty listed Elmer as both the applicant and the guarantor.  It stated that Elmer guaranteed payment of the account balance, plus interest and other charges, including reasonable attorney fees.  The guaranty was termed a continuing guaranty.

On or about May 11, 2006, Sandler placed an order for approximately $34,000 worth of goods.  In the coming months, VIS made multiple purchases from and payments to PVP.  Despite making some payments to PVP, over time, VIS amassed an outstanding balance of approximately $98,000.

PVP filed suit against LES and Elmer on October 10, 2007, alleging that LES and Elmer owed PVP the principle sum of $98,663.84 plus interest and attorneys' fees.  LES and Elmer denied the claims levied by PVP.  On October 15, 2009, LES and Elmer requested permission from the trial court to amend their answer to include a counterclaim against PVP.  The trial court granted this request and LES and Elmer filed a counterclaim in which they alleged that PVP had stolen certain computer software from VIS.  VIS then requested, and was granted, permission to intervene as an additional party defendant.  VIS filed an alternative counterclaim against PVP, alleging that PVP had stolen a computer program that was developed by a former VIS employee for VIS.

The trial court conducted a bench trial on February 11, 2011 and March 11, 2011.  Following trial, the parties filed proposed findings and conclusions thereon.  Upon reviewing

---

[4] Elmer does not claim that the personal guaranty was filled out without his knowledge or permission.

4

the evidence presented at trial along with the parties' proposed findings, on September 8, 2011, the trial court entered judgment against VIS in the amount of $214,788.62.[5] The trial court further determined that the personal guaranty signed by Elmer applied to VIS's debt to PVP, but was limited to $3000, and entered judgment against Elmer for $3000. This appeal follows.

## DISCUSSION AND DECISION

Initially, we note that PVP does not challenge the trial court's determination that VIS, not LES, should be responsible for the outstanding debts to PVP because the management of PVP knew that it was conducting business with VIS rather than LES. Instead, PVP contends that the trial court erred in determining that Elmer's personal guaranty was limited to $3000, and that, as such, he was not liable for any principle, interest, or attorneys' fees in excess of $3000. Elmer, for his part, contends that the trial court erred in determining that the personal guaranty applies to VIS's debts. Alternatively, Elmer contends that if the personal guaranty does apply to VIS's debts, the trial court correctly limited said guaranty to $3000.

### I. Standard of Review

The parties assert that this court is reviewing a general judgment on appeal. "In the absence of special findings, we review a trial court's decision as a general judgment and, without reweighing evidence or considering witness credibility, affirm if sustainable upon any theory consistent with the evidence." *Perdue Farms, Inc. v. Pryor*, 683 N.E.2d 239, 240 (Ind. 1997). However, where, as here, the trial court issues factual findings and conclusions

---

[5] The trial court determined that VIS owed PVP $98,633.84 in principal, $79,455.41 in interest, and $36,699.37 in attorney's fees.

thereon, we will set aside the trial court's judgment only if it is clearly erroneous. *In re Marriage of Nickels*, 834 N.E.2d 1091, 1095 (Ind. Ct. App. 2005).

> When reviewing the trial court's findings of fact and conclusions thereon, we apply a two-tiered standard of review. *W & W Equip. Co. v. Mink*, 568 N.E.2d 564, 569 (Ind. Ct. App. 1991), *reh'g denied, trans. denied.* First, we consider whether the evidence supports the findings. In determining whether findings are clearly erroneous, we construe the findings liberally in support of the judgment. *Citizens Progress Co. v. James O. Held & Co.*, 438 N.E.2d 1016, 1022 (Ind. Ct. App. 1982). The findings are clearly erroneous only when a review of the record leaves us firmly convinced a mistake has been made. *Cooper v. Calandro*, 581 N.E.2d 443, 444-445 (Ind. Ct. App. 1991), *reh'g denied, trans. denied.*
>
> Next, we determine whether the findings support the judgment. A judgment is clearly erroneous when unsupported by the findings of fact and conclusions thereon. *DeHaan v. DeHaan*, 572 N.E.2d 1315, 1320 (Ind. Ct. App. 1991), *reh'g denied, trans. denied.* In applying this standard, we neither reweigh the evidence nor judge the credibility of the witnesses. *Donavan v. Ivy Knoll Apts. Partnership*, 537 N.E.2d 47, 50 (Ind. Ct. App. 1989). Rather, we consider the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.* Finally, we must affirm the judgment of the trial court unless the evidence points incontrovertibly to an opposite conclusion. *Id.*

*Scott v. Scott*, 668 N.E.2d 691, 695 (Ind. Ct. App. 1996).

## II. Indiana Authority Relating to Guaranties

### A. Definition of Guaranties

"A guaranty is defined as a promise to answer for the debt, default, or miscarriage of another person." *Grabill Cabinet Co. v. Sullivan*, 919 N.E.2d 1162, 1165 (Ind. Ct. App. 2010) (internal quotation and citation omitted). "It is an agreement collateral to the debt itself and represents a conditional promise whereby the guarantor promises to pay only if the principle debtor fails to pay." *Id.* (internal quotations omitted). "Under Indiana law, three parties are required to execute a guaranty agreement: the obligor or principal debtor, the

6

obligee or creditor, and the guarantor or surety." *S-Mart, Inc. v. Sweetwater Coffee Co.*, 744

N.E.2d 580, 585 (Ind. Ct. App. 2001), *trans. denied*.

> A continuing guaranty is defined as a guaranty that:
>
> "contemplates a future course of dealing encompassing a series of transactions.... [A] contract is continuing if it contemplates a future course of dealing during an indefinite period, or if it is intended to cover a series of transactions or succession of credits, or if its purpose is to give to the principal debtor a standing credit to be used by him from time to time. A continuing guaranty covers all transactions, including those arising in the future, which are within the contemplation of the agreement."

*Id.* (quoting 38 Am. Jur. 2d Guaranty § 20 (1999)); *see also Vidimos, Inc. v. Vidimos*, 456

N.E.2d 455, 458 (Ind. Ct. App. 1983) ("continuing guaranty is not limited to single

transaction, but contemplates a future course of dealing encompassing a series of

transactions"). "Moreover, a continuing guaranty 'is not limited in time or amount and is

operative until revoked.'" *S-Mart*, 744 N.E.2d at 585 (quoting 49 Am. Jur. 2d Landlord and

Tenant § 819 (1995)).

### B. Interpretation and Construction of Guaranties

The rules governing the interpretation and construction of contracts generally apply to the interpretation and construction of a guaranty contract. *Kordick v. Merchants Nat'l Bank & Trust Co. of Indianapolis*, 496 N.E.2d 119, 123 (Ind. Ct. App. 1986). The extent of a guarantor's liability is determined by the terms of his or her contract. *Id.* The terms of a guaranty should neither be so narrowly interpreted as to frustrate the obvious intent of the parties, nor so loosely interpreted as to relieve the guarantor of a liability fairly within its terms. *Id.* The contract of a guarantor is to be construed based upon the intent of the parties, which is ascertained from the instrument itself read in light of the surrounding circumstances. *Skrypek v. St. Joseph Valley Bank*, 469 N.E.2d 774, 776 (Ind. Ct. App. 1984); *Orange-Co., Inc. v. Brown*, 181 Ind. App. 536, 393 N.E.2d 192, 195 (1979).

A guarantor's liability will not be extended by implication beyond the terms of his or her contract. *Goeke v. Merchants Nat'l Bank & Trust Co. of*

7

*Indianapolis*, 467 N.E.2d 760, 765 (Ind. Ct. App. 1984), *trans. denied* (1985). "A guarantor is a favorite in the law and is not bound beyond the strict terms of the engagement. Moreover, a guaranty of a particular debt does not extend to other indebtedness not within the manifest intention of the parties." *Id.*

*Id.* at 585-86.

In absence of ambiguity, the construction of a guaranty is a question of law. *Goeke*, 467 N.E.2d at 765. However, "'[i]f the court finds that any term is ambiguous, then the parties may introduce extrinsic evidence of its meaning, and the interpretation of that term becomes a question of fact.'" *Id*. (quoting *Loudermilk v. Casey*, 441 N.E.2d 1379, 1383 (Ind. Ct. App. 1982)). "'A word or phrase is ambiguous if reasonable people could differ as to its meaning.'" *Id*. (quoting *Loudermilk*, 441 N.E.2d at 1383). Any ambiguities in a contract are to be construed against the party who employed the language of the contract. *Id*. at 769.

### III. Analysis

In the instant matter, the trial court determined that based on the circumstances surrounding the submission of the personal guaranty by Elmer, it was unambiguous that Elmer intended for the personal guaranty to apply to the debt incurred by VIS. The trial court also determined that in light of these same circumstances, the personal guaranty should be limited to $3000. While we find the guaranty itself to be ambiguous, we agree that the personal guaranty should apply to the debt incurred by VIS and should be limited to $3000 in light of our review of the surrounding circumstances and the extrinsic evidence that was introduced by the parties.

The record demonstrates that Elmer, in his capacity as president of LES, submitted a credit application to PVP on May 5, 2006. Although the credit application listed LES as the

applicant, the parties understood that VIS would actually be ordering product from PVP through this account. On May 9, 2006, PVP sent a letter to Elmer "welcoming" him as a customer. Appellee's App. p. 11. The letter stated that PVP had "established an open terms credit limit on [LES's] account in the amount of $1,000.00." Appellee's App. p. 11. The letter further stated that the credit limit could be increased to $3000 if LES would elect to participate in PVP's direct payment program.

At some point on or before May 9, 2006, PVP also sent Elmer a personal guaranty. The personal guaranty was created by or on behalf of PVP and stated as follows:

> In consideration for the extension of credit to above Applicant by [PVP] the undersigned, jointly and severally, personally and unconditionally, guarantees payment of the account balance to [PVP] plus the interest and other charges referred to in this application including reasonable attorney fees. This is a guaranty of payment. The guaranty is personal in nature and the undersigned acknowledges personal liability and consents to having a credit bureau report pulled. This is a continuing guaranty, subject to cancellation only by registered mail directed to [PVP].

Appellee's App. p. 9. The personal guaranty had space for one to write in the applicant's name, the applicant's address and fax and phone numbers, and the location where the personal guaranty was executed. It also included a signature line for the guarantor's name. It did not have any space for one to write in the date that the guaranty was executed.

On or about May 10, 2006, the personal guaranty was returned to PVP. The personal guaranty, as submitted, listed Elmer as both the applicant and the guarantor. It did not make any mention of or reference to either LES or VIS or contain an execution date. Nothing in the record suggests that PVP, upon receipt of the personal guaranty, inquired as to why Elmer, not LES, was listed as the applicant or made any attempt to correct the alleged error.

9

Again, in construing a guaranty, a court must give effect to the intentions of the parties, which are to be ascertained from the language of the contract in light of the surrounding circumstances. *Noble Roman's, Inc. v. Ward*, 760 N.E.2d 1132, 1138 (Ind. Ct. App. 2002). Further, because the personal guaranty was created by or on behalf of PVP, any ambiguities therein must be construed against PVP. *See Goeke*, 467 N.E.2d at 769. Here, the personal guaranty, on its face, is ambiguous as it does not contain an execution date or any reference to LES or VIS. However, when we consider the personal guaranty in light of the credit application submitted by Elmer on behalf of LES, the May 9, 2006 letter sent to Elmer by PVP, and the timing with which these documents were exchanged, we conclude that it is clear that the parties intended for the personal guaranty to relate to LES's credit application, and that by signing the personal guaranty, Elmer intended to guarantee payment for the products ordered by VIS though LES's account. The trial court's findings to this effect are supported by the evidence.

Having concluded that Elmer's personal guaranty applies to the purchases made by VIS, we must next consider whether the record supports the trial court's determination that, despite the language indicating that the personal guaranty was a "continuing" guaranty, Elmer signed the personal guaranty under the assumption that LES's credit limit would be set at $3000. The May 9, 2006 letter, which indicates that PVP was willing to set LES's credit limit at $3000, provides the only written evidence concerning LES's credit limit. Nothing in the record indicates that the PVP and Elmer ever discussed raising LES's credit limit above the $3000 indicated in the May 9, 2006 letter sent to Elmer by PVP. Elmer did not request or

10

give permission for credit to be extended to LES in excess of the $3000 and nothing in the record indicates that Elmer was aware that PVP had allowed VIS to accumulate an account balance greatly exceeding the stated $3000 credit limit set by PVP.

Again, it is well-established the nature and extent of a guarantor's liability depends upon the terms of his contract, and a guarantor cannot be made liable beyond the terms of the guaranty. *Noble Roman's*, 760 N.E.2d at 1138 (citing *Fortmeyer v. Summit Bank,* 565 N.E.2d 1118, 1122 (Ind. Ct. App. 1991)); *S-Mart*, 744 N.E.2d at 586; *Goeke*, 467 N.E.2d at 765. Here, examining the circumstances surrounding the execution of the personal guaranty, we conclude that one could reasonably infer from the evidence that Elmer intended the guaranty to be limited to $3000. As such, we cannot say that the trial court's determination to this effect is clearly erroneous.[6]

We further conclude that the trial court correctly limited Elmer's liability to $3000 because the increase in liability from $3000 to $98,000 amounts to a material change in Elmer's risk and, as such, would require PVP to provide Elmer with notice of the increase in his potential liability under the guaranty. *See Phelps Dodge Corp. v. Schumacher Elec. Corp.*, 415 F.3d 665, 668 (7th Cir. 2005) (holding that under Illinois law, while a grantor is not required to notice for a modification to a guaranty due to fluctuations in price or other expected terms, a party who has a guaranty cannot be permitted to make a material increase of the risk that the guarantor will have to make good on the guaranty without notifying the

---

[6] Having concluded that the trial court did not err in limiting Elmer's liability under the personal guaranty to $3000, we further conclude that Elmer could not be held liable for interest and attorneys' fees in any amount in excess of the $3000 covered by the personal guaranty.

guarantor so that he has an opportunity to cancel it or demand modifications); *Cont'l Bank N.A. v. Modansky*, 997 F.2d 309, 314 (7th Cir. 1993) (holding that "a guarantor is not liable for anything which he did not agree to and if the creditor and principal have entered into an agreement materially different from that contemplated by the instrument of guaranty, the guarantor shall be released"); *S-Mart*, 744 N.E.2d at 585-87 (providing that while a continuing guaranty is generally not limited in amount, the guaranty will only extend to modifications that are non-material or that are material but shown to be within the contemplation of the parties at the time the agreement was executed in circumstances where the guaranty applies to modifications of the underlying agreement that were made without the consent by the guarantors); *Skrypek*, 469 N.E.2d at 777 (providing that a surety would be discharged from liability where there were binding changes in the underlying contract to which the guarantor or surety did not consent).

Here, nothing in the record indicates that the credit line covered by Elmer's personal guaranty was increased due to foreseeable fluctuations in price of the products sold to VIS, but rather indicates that PVP merely granted VIS a large increase over the original credit limit discussed by the parties. In addition, nothing in the record indicates that Elmer waived notification of or consented to any potential future material altercations of the personal guaranty. Thus, because we conclude that the increase from $3000 of potential liability to approximately $98,000 of potential liability amounts a material change that would necessitate notice to and consent from Elmer and that Elmer was neither notified of nor consented to this material change, we further conclude that Elmer cannot now be held liable for the

12

approximately $95,000 of debt incurred by VIS above and beyond the $3000 contemplated by the parties.

The judgment of the trial court is affirmed.

ROBB, C.J., and BAKER, J., concur.